UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Docket No. 18-CR-105-1 |
| Plaintiff | United States Courthouse |
| | Reading, PA |
| vs. | June 10, 2025 |
| | 9:55 a.m. |
| ALEXANDER DAVIS | |
| Defendant. | |

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JEFFREY L. SCHMEHL
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff: JOSH A. DAVISON
U.S. ATTORNEY'S OFFICE
615 CHESTNUT ST. SUITE 1250
PHILADELPHIA, PA 19106
215-861-8425
Fax: 215-861-8618
Email: josh.davison@usdoj.gov

For The Defendant: MADELYN K. WHITE
Carter Ledyard & Milburn LLP
28 Liberty Street
41st Floor
New York, NY 10005
212-732-3200
Fax: 212-732-3232
Email: white@clm.com

ALAN S. LEWIS
Carter Ledyard & Milburn LLP
28 Liberty Street
41st Floor
New York, NY 10005
917-533-2524
Fax: 212-732-3232
Email: lewis@clm.com

Audio Operator: Kenneth Duvak, Courtroom Deputy

Transcribing Firm: Intellectix Corporation

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**Index**


| | Direct | Cross | Redirect | Recross | Further Recall |
|---|---|---|---|---|---|
| **Witnesses For The Defendant:** | | | | | |
| Mr. Davis | 7 | 35 | 55 | 56 | 126 |
| Ms. Meehan | 60 | 97 | 119 | 125 | |

| Exhibit No. | Description | Offered By | Admitted | Pg. |
|---|---|---|---|---|
| Exhibit 1 | Evaluation Report | Defendant | Yes | 21 |

(Whereupon, at 9:55 a.m., the hearing was commenced.)

BAILIFF: All rise. The United States District Court for the Eastern District of Pennsylvania is now in session. The Honorable Jeffrey L. Schmehl is presiding.

THE COURT: Good morning, everyone. You may be seated.

ALAN LEWIS: Good morning.

ALEXANDER DAVIS: Good morning.

THE COURT: This is the time the Court has scheduled for a post-conviction evidentiary hearing in the case of the United States of America versus Alexander Davis. It is case number 105 of 2018. I understand, representing the United States, we have Assistant United States Attorney Josh Davison.

JOSH DAVISON: Good morning, Your Honor. Good to see you.

THE COURT: Good morning. And counsel for the defendant is Madelyn White-

MADELYN WHITE: Good morning, Your Honor.

THE COURT: -Esquire, and Alan Lewis, Esquire.

MR. LEWIS: Uh, that is me. Good morning, Your Honor.

THE COURT: All right. So now that everybody is here and ready to go, I understand we have at least two witnesses this morning. Um, how do we want to proceed, and in what order?

MR. LEWIS: Well, we're going to call, uh, Mr. Davis first, Your Honor.

THE COURT: Okay.

MR. LEWIS: Uh, I believe he's in the courtroom.

THE COURT: Yes, he is.

MR. LEWIS: Um, and just to let the Court know, the only document I intend to introduce into evidence is a report, uh, written by Dr. Dattilio. Mr. Davison has a copy. Um, that's the report from the expert, uh, you know.

THE COURT: Understood. That will be, uh, Defense Exhibit One. I don't know if you want to give a little, uh, you know, I mean, I'm very familiar with criminal law, so if you want to give a brief preamble or whatever, you're welcome to do that. If you just want to get into the testimony, you're welcome to do that, too.

MR. LEWIS: I'm— I'm happy to summarize the motion, the making of which brings us here today, if that's helpful to the Court.

THE COURT: Okay, well, let's do that.

MR. LEWIS: Sure. So Mr. Davis, uh, was arrested, and he's— he's in the courtroom.

THE COURT: Yeah, no, I see. I mean, I don't know him. I've never seen him before, but I'm assuming you said that's my witness. But, you know, the case was tried by Judge Smith in Easton. Judge Smith has now, unfortunately, passed away, and, uh, the case was reassigned to me.

MR. LEWIS: Um, so Mr. Davis, uh, was, uh, convicted

in 2018 of charges that stemmed from his response to an- a personal advertisement and, and subsequent email exchanges, um, when he went to meet with a person, uh, that he thought he had been exchanging texts with, he was arrested. There were, uh, explicit texts. Uh, he was charged with, uh, crossing state lines with the intent of having sexual relations with a person under the age of 18. Um, and, um, his counsel had engaged an expert, Dr. Frank Dattilio, to give testimony, uh, uh, expert testimony. Dr. Dattilio had done a clinical examination of our client and was prepared to testify at trial. Uh, defense counsel ultimately did not call Dr. Dattilio. And, um, it's our view, as articulated in the motion, that that was ineffective, uh, because there was, uh, the, the testimony had been able to be admissible, uh, we believe it would have been helpful, couldn't have been harmful, and, um, our contention is that there was no satisfactory strategic reason not to call Dr. Dattilio as a witness at the trial. That's it in broad strokes, uh, maybe sufficient, uh, for purposes of this—

THE COURT: Yeah, certainly, I mean, yeah, I was pretty much aware of all that. So anyway, um, all right, you may call your first witness.

MR. LEWIS: We call, uh, Mr. Alexander Davis.

THE COURT: Mr. Davis, right up here to the witness stand. When you get to the stand, please remain standing and, uh, keep your right hand raised.

MR. LEWIS: Can you hear me well from counsel table?
THE COURT: I can.
MR. LEWIS: Am I okay here?
THE COURT: Yeah, I think so. If I have a problem, I'll let you know.
ALEXANDER DAVIS, DEFENSE WITNESS, SWORN
BAILIFF: Thank you, sir.
THE COURT: Your witness.

**DIRECT EXAMINATION**

**BY MR. LEWIS:**

Q. Uh, good morning, Mr. Davis.
THE COURT: You may be seated.
MR. DAVIS: Thank you.
THE COURT: Good to see you. Thank you. Please pull the microphone close to you so that, uh, everybody in the courtroom can hear you, and your voice can be recorded.
MR. DAVIS: Thank you.

**BY MR. LEWIS:**

Q. Uh, Mr. Davis, how old are you?
A. Currently, I'm 38.
Q. And are you employed?
A. Yes.
Q. How are you employed?
A. I'm employed in a, um, plumbing supply building material manufacturer/distributor.

Q. And very briefly, what do you do for that employer?
A. I do sales.
Q. And how long— when did you begin to do sales for that employer?
A. Before my incarceration, um, three years and then the break of the incarceration, and I started again after I was released.
Q. All right.
A. Until current.
Q. Uh, I'll be asking you questions about the trial in 2018 at which you were found guilty of charges that included traveling and interstate commerce to engage in illicit sexual conduct. Um, do you remember that the events that led to your being criminally prosecuted started with a personal advertisement you answered on a website called Craigslist?
A. Yes.
Q. And at that time, did Craigslist organize personal advertisements by subcategory?
A. Yes.
Q. And do you remember in what category the advertisement was that you answered?
A. Casual Encounters.
Q. Okay. And were you familiar with the Casual Encounters section of Craigslist before answering the ad in question?
A. Yes.
Q. Had you previously answered advertisements placed there?

A. Yes. Yes.
Q. About how many times before you answered the ad that led to your char- being charged?
A. More than a hundred, several hundred.
Q. You say that the site was called Casual Encounters. What was your understanding then of what that meant?
A. Casual Encounters, in my understanding, is two people who do not wish to engage in any form of enduring relationship or, um, emotional connection; they just want to meet up to, um, have sex or— and, and have adult fun, you know, for that purpose of just a casual encounter and move on.
Q. Before answering this particular ad, had you previously met in person with others that you, uh, were introduced to through the Casual Encounters section of Craigslist?
A. Yes.
Q. And about how many persons had you actually met with before you answered the ad about which I'm asking you today?
A. Between a half dozen and a dozen, approximately.
Q. And had you previously had sexual relations with any of the persons that you had met through Casual Encounters Craigslist?
A. Yes.
Q. And about how many times?
A. Half of the people that I've— that I met. So, about between three and a half a dozen, four and a half a dozen?
Q. So are you able to say why it was that sometimes you didn't

have sexual relations with people that you met through the Craigslist, uh, website?

A. There are many factors involved. Um, the main thing is when meeting in person, you see more, or the more- more of the truth, or the truth of what— who they represented themselves. Many times, they mis- misrepresented themselves. Sometimes they were completely different than how they represented themselves, and, you know, there also has to be an attraction and a, um, understanding between us before we move forward. And therefore, not in all cases of meeting was that present.

MR. DAVISON: Your Honor, may I just inquire, uh, is counsel intending on essentially recreating direct as it was at trial because it just sounds like—

THE COURT: No, I— I understand. I understand the objection. I mean-

MR. LEWIS: Clearly, I mean it is introductory to this-

THE COURT: I— I know. It's important to have a little bit of background, but we, you know, we can't go too far afield.

MR. LEWIS: Right. Okay.

**BY MR. LEWIS:**

Q. Um, Mr. Davis, before you answered the ad that led to your arrest on Craigslist, had you answered advertisements on similar websites?

A. Yes.

Q. And is there a name or names of other websites?

A. One in particular is Backpage.

Q. Right. And, um, when did you start pursuing, for lack of a better word, casual sex?

MR. DAVISON: Judge, it's the same objection. Like, this was about five hours, I think, in testimony on direct. It is all in the transcript. If counsel's offer of proof is that he's gonna essentially— which I would expect him to say the same thing— I'm not sure how this bears on whether calling Dr. Dattilio would have been meritorious or proper by counsel. I'm not sure how his testimony today is going to alter that.

THE COURT: All right, he's objecting to your, uh, presenting background testimony that isn't relevant to the issue at hand, which is whether or not the doctor should have been called as a witness at trial. So what is your response, counsel?

MR. LEWIS: Um, I'm going to connect it to the decision not to call Dr. Dattilio, uh, with my questions quite shortly. I— I represent to the Court we're not going to repeat the trial testimony. It is, uh, its background, but it'll be connected to what- the questions I'm going to ask him today.

THE COURT: All right, let's get there. Um, if you can continue to object if you think it's, uh—

MR. DAVISON: How long do you think— how much depth

are you— because this— we're not even talking about the charges yet. We're talking about his behavior prior to the charges. If I just could, in about a minute, the— Judge Smith had limited the testimony of Dr. Dattilio to the issue of whether or not the defendant was— whether he could conclude, based on his evaluation of the defendant, whether he was interested in, uh, minors 13 years and below. That was the limit upon which, um, Judge Smith was going to allow Dr. Dattilio's testimony.

MR. LEWIS: We— we don't- I'm sorry.

MR. DAVISON: If— if counsel is going to elicit his entire sexual habits, his sexual addiction, all of those, I— I don't believe that was even on the table to be admitted as testimony. So the government, I— I don't know how long council intends on going through this background, but the background that we've heard so far is extremely far afield. Um, I'm just wondering how long that— that will take because it's all, excuse me, in the record already.

MR. LEWIS: Your Honor, I agree some of this is in the record, but respectfully, Mr. Davison's description of the testimony Dr. Dattilio would have given and is allowed to give is some- somewhat different than he just described. Uh, Dr. Dattilio—

THE COURT: Isn't the testimony— wouldn't he be restricted to the four corners of his report, like any other expert?

MR. LEWIS: Your Honor, the report was held to be prepared for a different purpose, so it wasn't even about the written report.

THE COURT: I'm not saying everything in the report, but he wouldn't be allowed to testify to something that's not in the report, right?

MR. LEWIS: Well, there'd been a Daubert hearing, and Judge Smith ruled on the permitted scope of Dr. Dattilio's testimony, but that scope was broader than what Mr. Davison just said, that is, his testimony, uh, would have been about whether—

THE COURT: Did he rule in writing? Is there a transcript?

MR. LEWIS: They're on transcripts.

MR. DAVISON: Your Honor, if I could quote from September 27, 2018, page 310 of the transcript, line 18, the Court: "So, as I understand it, the only thing Dr. Tilly— Dr. Dattilio will be testifying about has to do with the fact that Mr. Davis has no sexual arousal patterns towards children. He's not a pedophile. He basically has no interest in children in a sexual way based on his evaluation of Mr. Davis, basically, that he's not interested in children sexually." Ms. Meehan, response. "Correct, Your Honor."

MR. LEWIS: So, um, the object— the— the point I was trying to make is that Dr. Dattilio— and this is all going to

come out in the testimony, Your Honor. It's Dr. Dattilio who used the word pedophile, and he explained in his Daubert hearing testimony that that word is used to have two different meanings. It has a very hyper-technical meaning, which is the meaning that Mr. Davison just referred to in terms of an attraction, uh, to children 13 years of age or younger, but it is also used by people, by forensic psychologists to refer more broadly to people with a sexual attraction to children, including children older than 13. And Dr. Dattilio's conclusion was that Mr. Davis is not sexually attracted to children and, and when he came to that conclusion, his conclusion was not limited to a sexual attraction to children under 13. It included children over 13.

MR. DAVISON: Oh, and with respect to counsel's argument, we— we can go back and forth on that. I guess the government's point right now is I'm not sure how the defendant's testimony has anything to do with this. The government will stipulate that the defendant testified that he believed that he was meeting up with an adult, that he testified that he had at trial that he had no sexual interest in children; the government will stipulate that that was his testimony. The jury ultimately rejected it, but that was his testimony. So, if the counsel seeks to elicit that from the defendant today, it will take a long time, but the government just isn't sure of its purpose because the government will

stipulate that it understands that that is the defendant's contention.

THE COURT: All right, let's— let's try to get to the relevant testimony.

MR. DAVISON: Right.

**BY MR. LEWIS:**

Q. Um, so, um, Mr. Davis, is it correct that you are— are you sexually attracted to children or teenagers?

A. No.

Q. And is your sexual attraction exclusively to adult women?

A. Yes.

Q. Okay. Um, coming back to the ad in question, was there a time you exchanged text messages with the person you understood to have placed the ad?

A. Yes.

Q. And in those text messages, did there come a time when the person you were texting with described their age as 14?

A. Yes.

Q. And as Mr. Davison just said at the trial, you testified that you did not believe that the person you were texting with was actually 14 years old. Is that correct?

A. Correct.

Q. And why was that?

A. Um, in my experience online, through this type of texting, almost everybody lies about either their age, their looks; um,

there was much language that was in the ad that led me to believe they were not a minor, such as the— in the ad they used the word "Please be discreet," which is usually used by married women. Or people of prominence who don't want to be told, uh, found out, as well as the number that they provided me to text when I called it multiple times, it was an adult female on the voicemail, and that was also, um, corroborated by the officer when he gave his testimony.

MR. DAVISON: Objection. I assume that- that is 100% not the case. Move to strike without the officer testifying.

THE COURT: All right. The objection's, uh, granted, and that is stricken.

MR. DAVIS: Another thing is, um, that the— the language that they used about why not— they didn't want to send a photo. They said that their— that their mother put a hot needle through the camera lens, which is the most ridiculous thing I've ever heard. Um, other language that was used, like, please be— please drive safe and texting during, uh, normal school hours or business hours where they're not— usually they're not allowed to use their phone, which also indicated that they weren't being honest.

MR. DAVISON: Your Honor, objection moved to strike. What— what counsel is doing and what the defendant is doing is he is reciting expert testimony that was presented at trial from an expert, a purported expert on the psychology of online

communications. These were matters that that expert, Dr. Hancock, cited as— as elements that he might think that these texts could be produced by an adult. The defendant did not testify in that fashion at trial, and what— what the defendant is seeking to do now is recreate his mens rea at the time of the offense. This is, uh, a complete misrepresentation of what he thought at the time; the government is pointing this out because the government had the benefit of listening to that testimony, and now that testimony is— the defendant is seeking to mirror the testimony of that expert, passing it off as his own when he did not do so at trial.

THE COURT: So, he did not testify like this at the trial?

MR. DAVISON: Absolutely not, which is why this— this recreation is entirely prejudicial and unnecessary. It has no bearing on the issue with regard to defendant's motion.

MR. LEWIS: It— it— it- does have a bearing. First of all, my question was, to Mr. Davis, was about his understanding, and his testimony is— I did not-

THE COURT: Well, he can't say that he realized he didn't think it was an adult because they put a hot needle through a camera when somebody else said that, and it was somebody else's opinion.

MR. LEWIS: Yeah, but-

THE COURT: I mean, Mr. Davidson's saying it was the

expert's opinion that these things led to the conclusion that the person might have been an adult. Not his thinking.

MR. LEWIS: So, respectfully, nothing that he has said today is inconsistent with his testimony at the trial. It— it, um, he— he's testifying that he did not believe, which has always been his testimony, that the person he was communicating with was not a 14-year-old, was not a minor, and he's given some of the reasons that he could go on.

THE COURT: He said he didn't give those reasons at the trial when he took the stand. So he either did or he didn't. And by the way, the best evidence of that is the transcript. And there's a transcript. So, I don't want to hear him say what he said at trial. I want you to point out what page, what line, what he said. Because that's the best evidence, isn't it?

MR. LEWIS: Uh-

THE COURT: Not how he remembers what he said three years ago, or actually, seven years ago.

MR. LEWIS: Well, he's not trying to remember from a witness stand what he said at the trial.

THE COURT: Well, he has to.

MR. LEWIS: Well, he hasn't committed the trial transcript to memory. He remembers the trial quite well, of course. But he's just— I'm gonna move on, but I'm just— I've— I've had him explain to the Court some of the many reasons why

he didn't think that he was texting with a 14-year-old. Now, it is—

THE COURT: Well, now or then?

MR. LEWIS: At the time, he was texting with a person. Not-

MR. DAVISON: Your Honor, respectfully, his opinion doesn't matter. The jury rejected it. Counsel's motion now is that this other evidence would have helped sway the jury. That's what this hearing is about. It's not what about this defendant thinks.

MR. LEWIS: Respectfully, Your Honor, the— and I will get there— but Mr. Davis testified at trial, and, as he's going to explain, when he decided to testify and when the testimony was shaped, it was shaped in relation to an overall defense strategy that included calling Dr. Dattilio. So, so, as he's going to explain the- the defense would have been presented somewhat differently.

THE COURT: Who's this Hancock? Is he a doctor?

MR. LEWIS: Han- no, Hancock is an expert, um-

MR. DAVISON: He's a professor at Stanford who was called over objection of the government, who offered testimony about the psychology of the chats. He's someone who analyzes sting chats and noted for the defense that some of the language used by the undercover officer was adult language, like 'please be discreet' or 'drive safely.' And he pointed out to the jury

that the defendant would have some basis, he pointed out that the defendant might have some basis to believe that it's an adult because of the particular language used in certain instances.

MR. LEWIS: That's correct, but I will move along, Your Honor.

**BY MR. LEWIS:**

Q. Um, your original lawyer was someone named Mr. Heitzman. Do you remember that?

A. Yes.

Q. And did Mr. Heitzman arrange for you to be evaluated by a talk— by a doctor, a psychologist named Frank Dattilio?

A. Correct.

Q. How many times did you meet with Dr. Dattilio?

A. Um, at least two times.

Q. And how long were those meetings?

A. Several hours, three, four hours each.

Q. And what— what, roughly, um, just generally, what happened in those meetings? What did Dr. Dattilio do?

A. Um, he gave me multiple written, um, examinations to fill out, as well as he, um, asked me many questions, um, regarding my life in general and in specific. Um, that— that was what it consisted of.

Q. And did he, in addition to talking to you, do you— do you remember if he spoke to other people in your family?

A. Yeah, he spoke to almost everybody in my family: my wife, my father, my mother, my— my sisters, um, um, and he had a meeting— he had phone meetings with them as well, if not in person.
Q. And do you know if Dr. Dattilio reviewed, uh, records related to the case in addition to the conversations that he had with you and your family?
A. He reviewed all the transcripts, to my belief, all the text messages and emails between, um, me and the officer.
Q. Other law enforcement reports, do- do you remember?
A. I do not recall.
Q. Do- do you know if Dr. Dattilio prepared a written report about you?
A. Yes.
Q. Okay, and you have you seen that, that, and read that?
A. Yes.
Q. Okay, um, to your knowledge, did Dr. Dattilio come to a conclusion about whether you were sexually attracted to children?
A. Yes.
Q. And to your understanding, what was his conclusion?
A. His expert opinion was that I am not attracted to minors.
MR. LEWIS: Okay. Um, Your Honor, may I hand up a binder? Uh, it has, um, a few tabs, the first of which is Dr. Dattilio's report.

THE COURT: Yes.

MR. LEWIS: Um, and then the other, the rest of the binder is the transcript of the trial.

THE COURT: Do you want the witness to refer to that?

MR. LEWIS: Yes. Um-

MR. DAVIS: Thank you.

**BY MR. LEWIS:**

Q. Mr. Davis, please take a look after tab one in the binder. Um, it is- the first page of it has, uh, it says Frank M. Dattilio, Ph.D., and it's titled Psychological Evaluation, uh, and Sexual Risk Assessment/Mitigation Report, uh, and it's 19 pages. Uh, please take a look at that document.

A. Okay.

Q. And is that the report that Dr. Dattilio prepared about you?

A. Yes.

MR. LEWIS: So that's the report we're moving into evidence, Your Honor.

MR. DAVISON: No objection.

THE COURT: Great.

**BY MR. LEWIS:**

Q. Um, Mr. Davis, at the time that your first lawyer, Mr. Heitzman, had you see Dr. Dattilio, were you being prosecuted in state court but not in Federal Court?

A. Yes, correct.

Q. And, um, at some point in time, was the state, you know, if the state case was dropped in favor of a federal prosecution?
A. Yes.
Q. Okay. And when that happened, did you get different lawyers to represent you in the federal case?
A. I did.
Q. Who were the people who became your lawyers on the federal case?
A. They were federal public defenders by the name of Mara Meehan Esquire and Cathy Henry Esquire, I believe.
Q. And before your trial was held, did you formulate a defense strategy with your lawyers, with the lawyers from Federal Defenders?
A. Yes.
Q. And can you describe what that strategy was?
A. The strategy was that I was going to testify to the truth that I'm not attracted to minors and that I didn't believe they were who they said they were. That, um, we were going to interpret the texts as well as, um, go over my background to see, you know, what led up to this. And then we were going to have two expert witnesses who were going to corroborate and back up what I had testified about, so the jury can see that I'm not just full of hot air, that I'm actually telling them the truth and not speaking just from trying to get off.
Q. And was one of those witnesses, Dr. Dattilio?

A. Yes.
Q. And how would he, uh, according to the defense strategy, how would he hopefully have corroborated your testimony?
A. Well, he was supposed to testify that I'm— am not attracted to minors, which was the basis of the whole testimony, the whole defense. That was the— that was the strategy.
Q. So, um, did it come at a time when Dr. Dattilio testified in Court outside the presence of a jury?
A. Yes.
Q. And, um, at what point in the day- was that during the trial, while the jury trial was ongoing?
A. Yes.
Q. And at what point in the day, roughly, did Dr. Dattilio give his testimony?
A. It was after 5:00 p.m.
Q. Okay. Um-
A. Maybe even after 6:00, I'm not sure.
Q. So it was— it was in the late afternoon or evening after a day of testimony before the jury?
A. Yes.
Q. Did you know that Dr. Dattilio was going to be testifying at that hearing?
A. No.
Q. Did your lawyers, uh, appear to know that he was going to be testifying on that day outside the presence of a jury?

A. I don't believe so.
Q. And why— why do you believe they didn't know that?
A. Um, they called him that day to testify in front of the jury. Um, we were supposed to— it was supposed to be my testimony, Dr. Hancock and, and then, Dr. Dattilio; that was the order. Um, and when this was represented, they— they didn't even know about the Daubert hearing, to— to my understanding.
Q. Okay. Just if it would refresh your recollection to look at the testimony from that day, I'm going to refer you to, uh, page 331 of the appendix. That is the numbers at the bottom of the page. I'm sorry? I'm sorry, that's within tab 2. And, uh, if you look at the lower right-hand corner, the pages are numbered, uh, in large, bold numbers.
MR. DAVISON: Can we just, uh, agree to either use the appendix or the real numbers? Just so— because they're very close, just so there's no confusion here?
MR. LEWIS: Well-
THE COURT: We're not gonna use the report?
MR. LEWIS: We're gonna use the appendix numbers.
MR. DAVISON: The appendix is from the appeal. The pages on the top are from the trial transcript. I referred, when I referred before, I referred to the trial transcript. I just want to make that clear.
THE COURT: Okay, what are you asking him to look at?
MR. LEWIS: Uh, appendix page 331, and 332.

THE COURT: Okay, not the report that's tab 1.

MR. LEWIS: Correct.

**BY MR. LEWIS:**

Q. So, um, do you see on page 331 where Judge— and this is on line, uh, 19, in the middle of that line, you see where it says, "I don't know if counsel are prepared to proceed to take testimony from him," and "him" is Dattilio, "outside the presence of the jury, or whether it's best to wait until he returns tomorrow morning." Do you see that?

A. Yes.

Q. And do you see that on the next page, on the lower right-hand corner 332? Uh, uh, Ms. Meehan, on line 12, said to Judge Smith, "I thought the court had made a ruling already on the admissibility of Dr. Dattilio." Do you see that?

A. Yes.

Q. So, what was your takeaway from Ms. Meehan's response, uh, to the Judge's observation? He didn't know if counsel were prepared to proceed. What— what was your understanding, uh, of that from the answer Ms. Meehan gave?

A. That she was surprised there was going to be a Daubert hearing at all. She was under the impression that he was just going to testify in front of the jury.

Q. Now, was it fair to say that your lawyers didn't otherwise directly tell the Court whether they were prepared to proceed to take testimony from Dr. Dattilio outside the presence of the

jury?

A. Yes.

Q. Did your lawyers ask— they— they— they— they didn't tell Judge Smith that they weren't prepared, even though he had asked them whether they were prepared?

MR. DAVISON: Your Honor, I would just object to the leading. I think he can answer what he remembered.

THE COURT: Overruled for now.

MR. DAVIS: Can you repeat the question, please?

**BY MR. LEWIS:**

Q. Um, first, did your lawyers ask for an adjournment of the hearing to prepare Dr. Dattilio before he testified at the hearing?

A. No, they did not.

Q. Did Dr. Dattilio seem to you to be prepared for the Daubert hearing?

A. No, he did not.

Q. Okay. Um, did that hearing begin by Judge Smith asking questions of Dr. Dattilio?

A. Yes.

Q. And, um, after the Daubert hearing, did you discuss Dr. Dattilio's testimony with your attorneys?

A. I did.

Q. And briefly, what do you recall them saying?

A. Um, I thought that the— the Assistant U.S. Attorney was

very tough on Dr. Dattilio, but I was also very hopeful because it seemed like he gave us a lot of ammo how to prepare him for in front of the jury, because he was so, um, he was so caught off guard by some of the questions or points that the Assistant U.S. Attorney made, and it seemed like the Assistant U.S. Attorney had given it all he's got. He really went at it. And I was very hopeful that now we would have a lot more of a, um, a lot more material to prepare for the jury so we can properly answer the questions that he was— the difficult questions that the Assistant U.S. Attorney was asking.
Q. Did you have such a conversation with your lawyer?
A. Yeah, this was the conversation. Correct.
Q. And so, after the Daubert hearing testimony, was the plan still for the defense to call Dr. Dattilio at the trial?
A. Yes.
Q. And, uh, in preparing your own testimony for the jury, was it based on the understanding that Dr. Dattilio would also testify and, as you hoped, corroborate some of your testimony?
A. That was the plan all along.
Q. Um, was, um, did— so— so— so did you testify on the, on the next day following the Daubert hearing?
A. Yes.
Q. Okay. And I think you've answered the question, but when you did so, was it still your understanding Dr. Dattilio would testify after you?

A. Yes.
Q. Was Dr. Dattilio in the courtroom when you testified at the trial?
A. Yes, he was.
Q. Um, now, after you testified, your wife and another expert, Dr. Hancock, also testified, right?
A. Yes.
Q. And, uh, then the trial adjourned for a four-day weekend, right? Uh, after Friday, you next came back on a Wednesday. Do you remember that?
A. I do.
Q. And why was that? Why did you take off Monday and Tuesday from the trial?
A. Monday and Tuesday was the Jewish holiday of Sukkot, and, um, that we did not have trial on those days.
Q. So, uh, before you adjourned the trial on Friday afternoon to come back on Wednesday, did your lawyers tell you that they— anything about a— a changed decision about whether to call Dr. Dattilio?
A. No.
Q. Okay. Did you speak to your lawyers between Friday night and the following Wednesday?
A. No, I did not.
Q. Okay. Um, so when you arrived in Court the following Wednesday, was your expectation, your thinking, that Dr.

Dattilio would be testifying that day?
A. Yes.
Q. Okay, so what happened Wednesday morning? Did Dr. Dattilio testify?
A. So, when we left the courtroom Friday, I remember my lawyers telling Dr. Dattilio, "We're sorry we couldn't get to you today. The next morning in court at 9:00 a.m., you're going to testify about," then we parted. Um, when I came in on Wednesday morning, the defense stood up, and they rested, and I sh— I was shocked.
Q. When you said the defense rested, one of your lawyers stood up and told Judge Smith that they weren't calling any more witnesses; the defense was resting. In other words, they were not calling Dr. Dattilio or anyone else.
A. Correct.
THE COURT: Let me just ask a question to confirm this. While the trial was taking place, were you in custody or out of custody?
MR. DAVIS: In custody, Your Honor.
THE COURT: You were in prison at the time?
MR. DAVIS: Yes.
THE COURT: And you were being held where?
MR. DAVIS: I was being held in Leon County.
THE COURT: All right.
**BY MR. LEWIS:**

Q. So, um, before your lawyers said in open Court that they weren't calling Dr. Dattilio, did you have any idea that they were not going to call him?
A. No, I did not. I was shocked.
Q. So they never discussed with you that they had changed their minds about calling Dr. Dattilio until they communicated that decision of their own to the Court, is that right?
A. Correct. Yes.
THE COURT: Okay. Um, and this was Wednesday morning.
MR. DAVIS: Wednesday morning, Your Honor.

**BY MR. LEWIS:**

Q. Um, had you known, um, after the Daubert hearing, but before you testified that Dr. Dattilio was not going to testify, would that have changed, in your mind, the presentation of the defense in any way?
A. Um, yes, I— it would have.
Q. How?
THE COURT: The Daubert hearing was when? What night?
MR. LEWIS: Thursday evening.
THE COURT: Thursday night, and then there was a whole day of testimony Friday.
MR. LEWIS: Right, he testified on Friday, with the expectation Dau—uh, Dattilio would follow.
THE COURT: But he didn't.
MR. LEWIS: Correct.

THE COURT: When did the court adjourn on Friday?

MR. LEWIS: I don't, I don't know what time.

THE COURT: I mean, was it a whole day that he just didn't talk to him?

MR. DAVIS: Yes. It was— we left the courtroom at least at 4:00 or 5:00, maybe even after that. It was a full day of testimony.

MR. DAVISON: Th— that was my understand— my memory.

THE COURT: I mean, if he was gonna call him and Hancock, they couldn't have ex— even expected to get to Dattilio by Friday.

MR. LEWIS: I don't think he's testifying to his expectation on which day he was gonna testify, just that he would be testifying.

MR. DAVIS: If I may, Your Honor, from my understanding, I remember Ms. Meehan and Ms. Henry saying that this shouldn't take long, and they were expecting to get to all of the witnesses on Friday. That's why Dr. Dattilio showed up on Friday. He wouldn't have showed up if he wasn't expected to testify.

MR. DAVISON: It could be my memory is hazy, but I believe we had an extended Daubert hearing as to Dr. Hancock for his testimony, which contributed to the whole day.

THE COURT: Okay. I mean, it's not that important. I'm just trying to paint a picture in my mind about, you know,

how the trial took place. But go ahead.

**BY MR. LEWIS:**

Q. Okay. Um, are you certain that you would have testified at the trial if you had known at the time that Dr. Dattilio was not going to testify?

A. I would have re— I would have reconsidered it at least.

Q. Okay. What would you— is there anything you would have done if your lawyers had told you before resting that they were not going to call Dr. Dattilio?

A. Several things that, um, come to mind. First, I would have had a discussion with them of why are you doing this. We need to call him. Um, and I would have really fought for it because, you know, he was the cornerstone of the- of the- of the defense. I would have also— if that wouldn't have worked, I would have— I would have, um, possibly requested new counsel from the Judge because they— it was— it was a very confusing time because this— this was the— the whole basis of the defense was that we have these three ex— these two expert witnesses who are going to back up my testimony to the jury and then the jury would see that I'm not, you know, that I am telling the truth. And so I would have at least asked for new attorneys.

Q. Did you— did you later on talk to your lawyers at all after the trial about their reasons for not calling Dr. Dattilio?

A. Yes, I did.

Q. And what did they say?

A. They said that he, uh, didn't do well at the Daubert hearing.
Q. Okay. Did they refer to, um, any other efforts to prepare Dr. Daubert for his trial?
A. Dattilio.
Q. Excuse me, Dr. Dattilio. Thanks.
A. They did not re- reference any other, um, anything else other than he did horrible at the Daubert hearing.
Q. Right. Um, to your knowledge, did your lawyers ever prepare Dr. Dattilio to give testimony in court?
A. I- I don't have any knowledge of that.
Q. Okay. Did you ever talk to Dr. Dattilio about the fact that he didn't testify?
A. I did.
Q. And when was that?
A. Recently. Um, after I got released, I— I actually called his office and spoke to him about the report, and he said—
MR. DAVISON: Your Honor, I Object.
THE COURT: Yes.
MR. DAVISON: I would like to hear from Dr. Dattilio, but this is hearsay.
THE COURT: Objection sustained.
MR. LEWIS: Um, uh, I don't have any further questions.
THE COURT: Thank you. Thank you. Cross.

**CROSS EXAMINATION**

**BY MR. DAVISON:**

Q. Sir, do you remember when you first met with Dr. Dattilio?

A. I do.

Q. Was your criminal case still in state court?

A. Yes.

Q. Okay. You were being prosecuted by Northampton County?

A. Correct.

Q. And during any of your conversations with counsel, uh, it was first George Heitzman, right?

A. Yes.

Q. Did you discuss, um, doing what you could to, um, try to get the best plea that you could?

A. Yes.

Q. Okay. And in order to do so, did Mr. Heitzman explain to you that you would need some mitigation evidence? Do you recall those terms or something like that?

A. I do not recall those terms.

Q. Do you know what mitigation evidence means— that's in a lay term?

A. No, I do not.

Q. Okay. Would it be, well, I understand it to be evidence that would make you look sympathetic in front of a judge at sentencing so that you could get an attractive sentence at sentencing? Was there any discussion like that with your lawyer

about seeing Dr. Dattilio for that purpose?

MR. LEWIS: Objection, Your Honor.

THE COURT: What's the basis of your objection?

MR. LEWIS: He's asking questions about his, uh, conversations with a different lawyer who handled a different case that—

THE COURT: Well, he can testify. It's not hearsay. It may be relevant as to how the doctor prepares reports. Your objection's overruled.

MR. DAVIS: Can you repeat the question, please?

MR. DAVISON: Sure.

**BY MR. DAVISON:**

Q. During your conversations with Mr. Heitzman, did you understand that you were going to Dr. Dattilio so that he could provide a report which would be helpful for you at any potential sentencing hearing?

A. That was not my understanding initially.

Q. Okay. Well, when you first went to Dr. Dattilio, it was when the case was purely criminal, correct?

A. The case was always criminal.

Q. Sorry, in state court?

A. Yes, state.

Q. And what was your understanding of your exposure in terms of prison time at that point?

A. Zero to nine months.

Q. Okay. Much different than when you were indicted federally, right?
A. Yes.
Q. A world apart, correct?
A. Correct.
Q. And you knew that, once you were prosecuted federally, you faced a mandatory minimum sentence of 10 years, right?
A. Yes.
Q. Your attorneys told you that, right?
A. Yes, they did.
Q. Okay, and because of that, did you even consider pleading guilty in the federal case?
A. I did consider pleading guilty.
Q. Okay, but ultimately, you decided not to.
A. Correct.
Q. Were you considering pleading guilty in the state case before the case was federally adopted?
A. It was under consideration, yes.
Q. Okay. And how many times did you see Dr. Dattilio while your state case was still pending?
A. Twice.
Q. Okay. And to your recollection, was the written report- was there a written report prepared, um, while your case was still in state court, and that written report would be by Dr. Dattilio?

A. I hadn't seen any written report, but I would— it was my understanding that he was preparing a written report.
Q. Okay, and you read Dr. Dat- Datilio's report, right?
A. No, I did not get a copy.
Q. Well, you've read it since, right?
A. Since, yes.
Q. About how many times?
A. Half a dozen.
Q. Okay, and you've read it in preparation for this hearing, is that right?
A. Yes.
Q. Okay. And do you recognize that the title of the report, as reflected in- on the first page, that it's called a Sexual Risk Assessment\Mitigation Report?
A. I see that.
Q. Okay. What did that mean to you when you saw mitigation report?
A. I really didn't have any understanding of it, nor did I pay attention to it.
Q. Well, when the report was prepared, did you understand that this could be helpful for you at sentencing?
A. I thought the implications were much further than just sentencing.
Q. Really? Did any of your attorneys say that this report would be admissible at a trial?

A. I believe that the charges were dropped before the report was formulated.

Q. That wasn't my question. Did any of your attorneys tell you that the written report by Dr. Dattilio would be admissible at trial?

A. I don't understand the question.

Q. Did any of your attorneys tell you that this written report, let's see how many pages it is, 19-page report by Dr. Dattilio, would ever be able to be introduced at trial so a jury could see it?

A. Which attorneys are you referring to?

Q. Any of them.

A. They never men-

Q. Did any of them say that?

A. They never mentioned the report, uh, being introduced to the jury.

Q. Okay, because did they tell you that it wouldn't be admissible at trial?

A. They never told me.

Q. Do you recall- fast-forwarding, right? During the break in trial, as you mentioned, there was a Daubert hearing with Dr. Dattilio, right?

A. Yes.

Q. And you were present, right?

A. I was.

Q. Now, do you recall that the government, myself, was objecting to the testimony of Dr. Dattilio?
A. Yes.
Q. Do you recall that I was objecting that the fact that Dr. Dattilio would, in effect, be substituting what's in your head to the jury, and that, in my view, in my view, was improper?
A. I don't recall the details.
Q. Well, do you recall that I was taking the position that his testimony should not be heard by the jury?
A. I re— I don't recall that.
Q. Do you recall that the Judge was troubled by many aspects of what was proffered as his testimony to the jury?
MR. LEWIS: Objection to characterizing his impression of the Judge's mental state. We have a record. Judge Smith said—
THE COURT: Objection sustained. Rephrase the question.
**BY MR. DAVISON:**
Q. Do you recall that the Judge greatly limited the scope of Dr. Dattilio's testimony?
MR. LEWIS: Objection to characterizing the limitation. The limitation-
THE COURT: Over- overruled. He could answer that if he can.
**BY MR. DAVISON:**

A. Can you describe "greatly"?

Q. Yes. I quoted it before, and I'll read it again. This is page 310 of the transcript, not the appendix number. Uh, this is on September 27th, at the conclusion of the Daubert hearing. The Court quote, "So as I understand it, the only thing Dr. Ti- Dr. Dattilio will be testifying about has to do with the fact that Mr. Davis has no sexual arousal patterns towards children. He's not a pedophile."

A. That's exactly why we called Dr. Dattilio, so he actually testified to the entire scope of what we were trying to get.

Q. My question is, is do you understand that that was the limitation?

A. I don't understand. The- he-

THE COURT: That was the only thing he could have said.

MR. DAVIS: That's the only thing we wanted him to say, so it was perfect.

**BY MR. DAVISON:**

Q. Okay, so you understood that.

A. Yeah.

Q. And you understood that there was some discussion with Dr. Dattilio about what is a pedophile in terms of the age range. Is that correct?

A. During the Daubert hearing, correct.

Q. And in fact, Dr. Dattilio admitted that while pedophile can

be used to describe those 18 and under, in this particular case, he meant it for the ages that you did not have a sexual attraction to those 13 years old and younger. Is that right?
A. Incorrect.
Q. Okay, and do you also recall in his report that he did not see any child pornography amongst your, um, in your- in your electronic media?
A. Neither did you.
Q. Try to focus on the question. The- the-
A. Can you repeat it again?
Q. Yeah, just try to answer the question, okay? Do you recall that Dr. Dattilio concluded that you had no child pornography on your electronic media?
A. He concluded that, yes.
Q. Okay, and do you recall that during the Daubert hearing, there was a discussion about what a "hebephilia" or what "hebephilia" is? Is that right?
A. Yes.
Q. And that would be an attraction to those in a more older teenage range, is that fair to say?
A. I don't know.
Q. Okay, but you recall there was that discussion?
A. I never heard that term.
Q. Well, did you hear it at trial?
A. Yes, I did the first time.

Q. And do you recall Dr. Dattilio being asked that even for those-

THE COURT: You mean at trial, or you mean during the Daubert hearings?

MR. DAVISON: I'll specify.

**BY MR. DAVISON:**

Q. Do you recall that Dr. Dattilio, who only testified at the Daubert hearing, right that he was asked could someone who is not attracted to prepubescent girls still be interested in teenage girls 14 years and above?

A. Can you refer to a specific page?

Q. I can, but do you recall it?

A. I do not recall.

Q. Okay, you don't recall it. So you don't recall what his answer was, either.

A. I mean, it was a long trial.

Q. Well, but this went to the heart of the matter because in your case, you were accused and ultimately convicted of meeting up with a, or attempting, or having the intent to meet up with a 14-year-old, isn't that right?

A. Can you repeat the question?

Q. In your case in which you were convicted, you were accused and convicted of seeking or having the intent to meet up for the purposes of illicit sexual conduct with a 14-year-old.

A. Yes.

Q. And there was discussion at the Daubert hearing of the photo that was presented in the chats, right?
A. Yes.
Q. And in fact, Dr. Dattilio concluded that the photograph in the chats reflected a girl who was post-pubescent. Do you recall that?
A. No, I do not. If you could refer to the—
Q. Well, wasn't that the whole subject of the Daubert hearing about whether or not Dr. Dattilio's testimony would be relevant? Because we were talking about an underage minor who was post-pubescent, and so the whole analysis of whether you were a pedophile or not is irrelevant.
MR. LEWIS: Objection, Your Honor.
MR. DAVISON: Do you recall that?
MR. LEWIS: The entire hearing is being mischaracterized, uh, to ask- purely to make arguments directed at Mr. Davis. As I described earlier, Dr. Dattilio actually testified that he used the word "pedophile" in two different respects, but with respect to Mr. Davis, uh, he did testify that it was his opinion that Mr. Davis was not sexually attracted to teenagers, not only up to the age 13 but beyond that. So he was if you want to use the term, a hebephile to describe somebody attracted to older children; the essence of his testimony was that, in his opinion, Mr. Davis is not a hebephile either. So— but a lot of this, it's— it's— it's all

in the transcript for the court to read, and respectfully, we don't need to have arguments, uh, made to Mr. Davis asking him to remember exactly what Dr. Dattilio said about these hyper-technical subdivisions of— in the world of pedophilia.

MR. DAVISON: Your Honor, if I may respond: The counsel's argument is that, or it seems that, at least the defendant's argument, is that after a discuss— or after the Daubert hearing, something happened, And that he had a discussion or didn't understand why his attorneys were going in a different direction. The government is seeking to cross-examine him on the exact nature of what went wrong, or conceivably, at the Daubert hearing. So, and what his memory of that was, as it relates to counsel's very claim in saying that it's inexplicable that the def- that the defense attorneys failed to call Dr. Dattilio, whereas the government is trying to probe into the realities of what happened at that Daubert hearing and try to understand exactly what the defendant was thinking. He— his testimony was that, well, he thought that the AUSA was tough and that this gave us our ammo. Well, I— I would like to probe into that as to what the basis was he thought, number one, was tough. So I'm bringing specifics about the exact nature of Dr. Dattilio's, uh, testimony and— and presumptively what may have gone wrong.

THE COURT: All right, you may question that. If he doesn't know, he doesn't know, and if you need to, uh, I mean,

it'd be the more efficient way to do it, and if he doesn't remember, you can direct him to that part of the transcript if that's important. So, let's proceed.

**BY MR. DAVISON:**

Q. You— you stated earlier that the AUSA was tough. What— what did you mean by that?

A. You were very— getting very technical in the terms as you are getting very technical now. And, uh, Dr. Dattilio— I didn't believe was fully prepared for that line of questioning.

Q. And when you say technical, you mean when I talk about prepubescent and post-pubescent?

A. No. When you talk about the specific terms of pedophilia versus other terms.

Q. Well, can you understand—

A. Other terms, like hebephilia or eba- I don't even know them.

Q. Well, can you understand that someone who's a pedophile is attracted to younger children?

A. It was my understanding that pedophile is anybody under— attracted to anybody under 18 up until the point that you mentioned something.

Q. Well, and don't you recall Dr. Dattilio's testimony that you don't have to be a pedophile to be attracted to someone in the upper a- age range?

A. If you can, show me in the transcripts to refresh my-

Q. Okay, I'll be happy to, but my question is, you don't remember any part of that?
A. I remember-
MR. LEWIS: Objection. The question is misleading because, again, at the testimony, Dr. Dattilio testified that he used the word pedophilia. It was used in two different respects. There was that hyper-technical respect, up to 13. But he was clear, if you read the whole transcript and you read his report, that his conclusion was that Mr. Davis was not sexually attracted to children older than 13. So, can, uh, Mr. Davison sort of find a snippet, take it out of context, and read it to Mr. Davis to mischaracterize, uh, Dr. Dattilio's opinion about Mr. Davis? I'm sure he can. But we have the whole transcript, and we can all make arguments to the Court about the testimony Dr. Dattilio would have given, was allowed to give, but didn't give because his lawyers decided not to call.
MR. DAVISON: Well, I- I'll- I'll be happy to read the pages in which we discussed this.
THE COURT: Yeah, well, I do want to hear them, but he said just a little while ago that the testimony was limited to those three or four sentences, that that's all Judge Smith was going to allow. So everybody agrees to that, right?
MR. LEWIS: The record is clear on this permitted scope.
THE COURT: Judge Smith was going to say that he

wasn't a pedophile, but then not allow him to explain what he means by that?

MR. LEWIS: Oh, he was going to be permitted to explain that, in his opinion, Mr. Davis is not sexually attracted to minors, including minors older than 13-

UNIDENTIFIED SPEAKER: Seventeen.

MR. LEWIS: Yes, he w- he would have given that testimony.

MR. DAVISON: Your Honor, if I c- all right, page 330.

THE COURT: You have the floor, go ahead.

MR. DAVISON: Sorry.

THE COURT: It would probably respond to what we're talking about.

MR. DAVISON: Sure. Page 333. That's the page numbers at the top.

THE COURT: 333. Who is this? Dattilio.

**BY MR. DAVISON:**

Q. Well, you know what? We'll go back a little to page 331, just so it's all very clear, 331 in the middle, cross-examination of Dr. Dattilio. Okay, are you with me on line 11?

A. Yes.

Q. Okay, question to Dr. Dattilio: "Let me ask you this." Answer: "Yeah."

THE COURT: Wait, I got the wrong one.

UNIDENTIFIED SPEAKER: Yeah, where are you?

THE COURT: I got the wrong one. We got the wrong one.

MR. DAVISON: Page 331, that's not the appendix-

MR. DAVIS: The- the top.

THE COURT: We only have the appendix.

MR. DAVISON: Okay, well, I will find that right now.

MR. LEWIS: The- the- at the top right-hand corner are the page numbers from the trial.

THE COURT: Oh, okay, all right. I see that now. I see that now, okay. 331. Let me go to the page number.

MR. DAVISON: The appendix number is 356. Is that right?

MR. LEWIS: Yes.

**BY MR. DAVISON:**

Q. Okay. We're all on the same page, literally? Okay. Question: "Let me ask you this." Answer: "Yeah." "Someone can not be a pedophile, right? Let's say someone is not a pedophile, but they can be interested in teenage girls of the years of 14, 15-"

UNIDENTIFIED SPEAKER: Wait, where are we?

THE COURT: Yeah, where are you?

MR. LEWIS: Yeah, I don't see this.

THE COURT: I don't see that at all, even at 331.

MR. DAVISON: I have the trial transcript. I don't

know where your pages are coming from.

THE COURT: What is, what is your page number on the trial transcript?

MR. DAVISON: 331. I mean, th— these are counsel's appendix documents.

THE COURT: 331 begins with Ms. Meehan. It looks like your report refers to—

MR. DAVISON: Right. These are counsel's from the appellate record. This is not the trial transcript page number-

THE COURT: Well, then-

MR. DAVISON: I can find it.

THE COURT: We're not going to be able to follow that.

MS. WHITE: I think it's-

MR. DAVISON: Right, I understand. I just need a moment to find that.

MS. WHITE: Um, I think it's 363 to 364 of the-

MR. DAVISON: Okay, let me confirm that.

THE COURT: Pages or bottom?

MS. WHITE: It would be at the bottom, Your Honor.

MR. DAVISON: The appendix?

MS. WHITE: Yeah, 363 to 364 of the appendix.

MR. DAVISON: Okay, thank you. So it's line 23, page 363, at the bottom.

THE COURT: Okay, "let me ask you this."

**BY MR. DAVISON:**

Q. "Let me ask you this." Answer: "Yeah." Question: "Someone cannot be a pedophile, right? Let's say someone is not a pedophile, but they can be interested in teenage girls of the years of 14, 15, and 16 years old, right?" Answer: "They can, they can." Question: "Okay, are you saying from your report, as you remember, as you remember it, definitively, that the defendant has no interest in girls who are 14, 15, 16, and 17 years old?" "Yes." Question: "Based on what?" "Based on the fact that he believed that he was dealing with an adult who was not—" "Whoa, whoa, that's something else. That's something we can get into in a moment." "Well, you opened the door now. Just opened the door for that." "No, I'm fine to talk about that, doctor, but I'm asking about 14, 15, and 16, and 17-year-olds. Forget what he believed." "Right." "All right. It's not your job, right?" "Right." "Your job is to evaluate him." "That's right." "And you concluded that he's not a pedophile. So my question to you is, but does he have the capacity, in your expert opinion, to want to have sex with a 14, 15, 16, and 17 post-pubescent girl? Can you make that conclusion?" "Does he have the capacity? Can you define that for me?" Ms. Meehan, objection. Question: "That's your area of expertise." Ms. Henry: "It's an interest." Answer: "No, we don't." I rephrase. Just to move this along, I'm on the next page. "Can someone who is not a pedophile be aroused sexually, aroused by a 14, 15,

16, or 17-year-old?" "Yes." "Minor?" "Yes." "But they're not a pedophile?" "No." I'm gonna stop there. Mr. Davis, do you have a recollection of this back-and-forth—between me and Dr. Till—Dattilio?

A. I see it, yes.

Q. Okay, did you think at all at the time that that was problematic?

A. Define problematic.

Q. Problematic for you and for your defense.

A. No, I thought it was perfect.

Q. You thought that was perfect?

A. Yes.

Q. Okay, and you still maintain that today.

A. This was the ammo you gave us to prepare him properly after a long day. He was very tired, and you were relentless— like you are doing now, questioning, questioning, questioning without really giving time to answer, and you follow up, follow up, follow up. That's your style, and I commend you for that, but this was what we wanted to prepare for exactly. The fact that you are so tough, and you're twisting words back and forth, and you push him to, in my opinion, not really answer what he wants to answer, but what you're pushing him to answer, which is what a good attorney does, and I commend you for that again, but this is what the ammo we had to— to— to prepare for trial—and these types of questions.

Q. Do you recognize that Dr. Dattilio is Harvard-educated?
A. Correct.
Q. And you're saying I twisted in him- twisted him into saying what I just recited to you?
A. He had been in- in court that entire day in a separate case. This was already after 6:00, right, at least after 5:30 in the afternoon, and the ju— as the Judge pointed out, we were all very tired and weared *(sic)* out. And everybody except for you, that seems. And yes, I believe that he was unprepared, and with your relentless attacks, he could have misspoke or said something that he really didn't mean to say. I believe it's completely, um, possible.
Q. Okay, how did— how did he misspeak?
A. Well, earlier, as he said, that I am not a pedophile, and I'm not attracted to people 14, 15, 16, or 17.
Q. When did he say that?
A. You read it four minutes ago. I'll— I'll repeat it now.
Q. Okay, you think that's what he said?
A. Let's go back to, uh, what was the page we had, 360-
Q. I started on 363, line 23.
A. 363, line- No, I'm on the wrong 363. Oh, here. Okay. So let me ask, line 23 on 363. "Let me ask you this." "Yes." "Someone cannot be a pedophile, right? Let's say someone is not a pedophile, but they can be interested in teenage girls of 14, 15, and 16, right?" Hold on. "They can, they can." Okay. And

this is the key: "Are you saying from your report, as you remember it, definitively that the defendant has no interest in girls who are 14, 15, 16, and 17?" Dr. Dattilio answers, "Yes." So he testified that I am not attracted to people, to minors, under 18. Then you continue to drill him and somehow twisted his words for him to say what you wanted him to say, which is what a good attorney does, and that's great. That's why you're, you know, but here he definitively says that I'm not attracted to them.

Q. Do you recall—

A. Talking about me, not—

Q. Do you recall the next line when he says he believes that, based on the fact that you believed that you were dealing with an adult? Do you— do you see that line after it?

A. Again, I think that was due to his— he— he was very tired, but if you look at his report, he bases it on much more than that.

Q. Okay, I'm gonna wrap up, but this goes to my other point. Do you recall him indicating that his opinion was only worth its weight if you were being honest?

A. I don't recall that.

MR. DAVISON: Okay. Uh, I have nothing further, Your Honor.

THE COURT: Any further redirect to this witness?

MR. LEWIS: Briefly, Your Honor.

## REDIRECT EXAMINATION

**BY MR. LEWIS:**

Q. Okay. Um, uh, you remember Mr. Davison used the word "hebephilia" in his questions of you just, uh, right now?
A. Yes.
Q. And do you understand "hebephilia" to be an attraction to minors, uh, in a range that's, uh, older than 13 that would include a 14-year-old?
A. Yes.
Q. Okay. So, um, uh, did, um, Dr. Dattilio testify that he analyzed you with regard to hebephilia? Do you remember that he—
A. I— I don't remember if he specifically—
Q. So, direct— I'll direct your attention to page 348.
A. On the bottom?
Q. On the bottom of 348, 348 of the appendix.
A. Okay, yes.
Q. Line 23, you see that he was asked, "did you analyze him," him is you, "at all with regard to hebephilia?" See, the— the answer is yes?
A. Yes.
Q. Okay. And so, um, and so, what was your understanding of that Dr. Dattilio's analysis with regard to you and hebephilia?
A. Um, w- my attorneys actually Googled that word as they were talking about it 'cause they hadn't heard about it either, and

that's when I saw the definition.
Q. Right. And using "hebephilia" to refer to a person who is sexually attracted to 14-year-olds, what was Dr. Dattilio's conclusion about whether or not you were a "hebephiliac"?
A. That I was not.
Q. Uh, and is— is that clear to you? From the report that Dr. Dattilio wrote about you?
A. Yes.
Q. And from your conversations with Dr. Dattilio?
A. Yes.
MR. LEWIS: Thank you.
MR. DAVISON: Just briefly, Your Honor.
THE COURT: Yes.

**RECROSS EXAMINATION**

**BY MR. DAVISON:**
Q. Do you recall the next line? And this is the same page 349 on the bottom if you turn the page. The next question by me at trial was to Dr. Dattilio: "Is there a reason why," referring to his analysis about hebephilia, "Is there a reason why that isn't in the report?" Answer: "No, because the generic word is pedophilia. But I'll— I'll break that down when I speak- when I explain to the jury." Do you remember that?
A. The fact that the word hebephilia was not in the report? Yes.
MR. DAVISON: Okay. I have nothing further to add.

THE COURT: All right, thank you, sir. You may step down.

MR. DAVIS: Thank you, Your Honor.

THE COURT: All right, uh, let's take a ten-minute recess before we call the next witness. Court's in recess.

BAILIFF: All rise.

(Recess at 11:05 a.m., until 11:17 a.m.)

THE COURT: Good morning. Everybody may be seated.

MR. LEWIS: Your Honor, Ms. White just stepped out for a moment. During the recess, Mr. Davison and I had a discussion about whether Mr. Davis would be present for the testimony of Ms. Meehan, and he let me know the government wouldn't object to his presence, and so Ms. White just stepped out to discuss that subject with Mr. Davis.

THE COURT: All right, that's fine. Ms. Meehan, do you want to come up for a while? She's the next witness, right?

MARANNA MEEHAN: Sure, Your Honor.

MR. LEWIS: I think we'd like to— to— to wait to start asking questions.

THE COURT: I understand. I understand, but we can get her up on the stand, and we can swear her in, and, uh, she's an officer of the court; she doesn't have to be sworn.

MS. MEEHAN: Good morning, Your Honor.

THE COURT: Good morning. How are you? She doesn't have to be sworn. It's now 11:19. If you think we can finish,

I'll just go over lunch.

MR. LEWIS: Certainly expect to finish today, yes.

THE COURT: Well, I mean, it depends on— all right, we'll— we'll revisit it at 12:00 then.

MR. LEWIS: Right. I'm happy to go—

THE COURT: We'll decide— I mean, I mean, we decide whether or not to take a lunch break and when.

MR. LEWIS: I would hope, if we're still going at 1:00 or so, we would. I don't eat breakfast, so I have nothing in my system.

THE COURT: If we're going till 1:00, we're taking a break.

MR. LEWIS: Right, thank you.

THE COURT: If we're going to 12:30, maybe not. All right?

MR. LEWIS: Did we— did you read? He's on his way back. He's— he's on his way back. And...

THE COURT: Where was he?

MR. LEWIS: He's nearby, but do you have a sense as to how...

MS. WHITE: He would prefer not to stay.

MR. LEWIS: So, um... Okay, so— so, um... we— we— we had told him he could leave because we didn't think it was necessary for him to stay. Mr. Davison sort of raised the question as to whether he wanted to make a record of his

decision, you know, not to stay. I mean, we're representing to the court he— he knows that, uh, he could stay. Um, so, if you want, I sort of just present that to the— to the court before we begin with Ms. Meehan.

THE COURT: Well, I— in my opinion, it's his case. He always had— or has— the right to stay. So, um, especially if you commit that, you're not gonna recall him.

MR. LEWIS: We're— we're— we— we— we do not imagine that we would recall him.

THE COURT: I mean, if you're gonna recall him, then that— that creates a different issue.

MR. LEWIS: I mean, one— one can never be 100% certain about the need to recall a witness before the other witnesses have testified, but we don't anticipate doing that.

THE COURT: Well, you understand my point, then. If he's gonna be recalled, in rebuttal or summary form, he should not be listening to this witness's testimony.

MR. LEWIS: I— I hear, Your Honor. I— I— I might disagree if— and it might explain that if I wanted— if it— if we so strongly took the position that he should remain, but we don't think it matters.

THE COURT: Let's just proceed. Right. Let's go. Please, let's begin questioning the witness.

MR. LEWIS: Okay.

**DIRECT EXAMINATION**

**BY MR. LEWIS:**

Q. Um, good morning, Ms. Meehan.

A. Good morning.

Q. Uh, I'm Alan Lewis, and I represent Alexander Davis at this hearing, which is with respect to his 2255 petition. Um, how and where are you employed?

A. I am a— an Assistant Federal Defender at the Federal Community Defender in Philadelphia in the Eastern District of Pennsylvania.

Q. And for how many years have you been so employed?

A. It will be 30 years on August 16th of this year.

Q. Okay. In 2018, were you assigned to represent Alexander Davis in connection with charges of inducing a minor to engage in sexual activity and traveling and interstate commerce to engage in illicit sexual conduct?

A. I was assigned along with, um, Catherine Henry, who was an Assistant Federal Defender at the time, now a federal judge. Catherine Henry. The two of us were assigned.

Q. How would you describe your and Ms. Henry's respective roles in the defense?

A. We were partners, trial partners, and, um, from the beginning of the case through sentencing, although I think I may have handled the sentencing, um, myself at— at the time.

Q. So, I think you just indicated you're aware this hearing is to help the court decide Mr. Davis's 2255 petition to vacate

his conviction on the ground of ineffective assistance of counsel.

A. I'm aware, yes.

Q. And for about how long have you been aware that you might be called to testify at this hearing?

A. I think since late 2024.

Q. Did you do anything to prepare for this hearing?

A. Yes.

Q. What?

A. I reread, uh, the transcript of Dr., uh, Dattilio's Daubert hearing testimony, and I spoke with, um, an attorney who represents, uh, the Federal Community Defender.

Q. Okay. And who— who was that, if I may ask?

A. Ellen Brotman.

Q. And, uh, other than reading the transcript, did you look at any other documents, such as case files or anything else?

A. Oh, I'm— I apologize. I looked at the petitions that were filed.

Q. And when you said the petitions, you— did you look at the petition that Mr. Davis filed on his own pro se?

A. No, I did not. I— I looked at, uh, your petition and the government's reply.

Q. Okay, so I think— I think you're referring to the government's opposition to Mr. Davis's pro se motion and then my reply, once engaged by Mr. Davis, replying to the

government's arguments in opposition. Is that right?

A. Yes. I actually may have looked— I'm sorry, I may have looked at his pro se petition, but that would have been in late 2024. I don't recall.

Q. So, do— do you recall the events that led— that culminated in Mr. Davis's arrest, uh, beginning with his response to an advertisement in Craigslist?

A. Yes, very well.

Q. Okay. And it turned out that the advertisement was a— a law enforcement-placed advertisement.

A. Agent Block, yes.

Q. Right. And so, do you remember that mis— after Mr. Davis answered that ad, he had a text exchange, uh, uh, with, uh, on the other side, pretending to be the person who placed the advertisement?

A. Correct.

Q. And in the text exchanges, law enforcement officers posed as the advertiser and claimed to be a 14-year-old girl. Is that right?

A. That's right, yes.

Q. And ultimately, Mr. Davis arranged to meet the person he thought had placed the Craigslist ad.

A. Yes.

Q. And he was arrested when he, uh, arrived near the meeting place. Is that right?

A. That's right.
Q. And do you recall that Mr. Davis was originally charged, uh, with offenses in state court, where a different attorney represented him on the state charges?
A. Yes, I think— I think it was George Heitzman with a Z— Heitzman.
Q. But at a certain point after the arrest, you were appointed to represent Mr. Davis in connection with federal criminal charges brought in relation to this incident.
A. Correct.
Q. Um, and after you were assigned to represent Mr. Davis, did you formulate a defense strategy that focused on any particular element or elements of the charges that Mr. Davis faced?
A. Yes, the attempt specifically, which went up on appeal, and we did not prevail.
Q. You're aware— are you aware that to have convicted— to convict Mr. Davis, the government had to prove that he believed that a person he was attempting to persuade to engage in sexual activity was under 18.
A. Correct.
Q. So his— his belief, his mindset was, uh, an element of the criminal charges that— as to which the government bore the burden of proof.
A. Correct, and he denied that. No.
Q. So, would it be fair to say that a key issue in Mr. Davis's

case was whether or not he knew or believed that the person he was texting with was under 18?

A. Yes.

Q. So put another way, the defense was that Mr. Davis thought that the person whose ad he responded to and with whom he texted was an adult.

A. Correct. That— that is why we engaged, uh, Dr. Hancock.

Q. At some point, did you also become aware that Mr. Davis had been referred by his prior lawyer for an assessment by a forensic psychologist named Frank Dattilio?

A. Yes.

Q. Um, after you and Ms. Henry were appointed to represent Mr. Davis, at some point, you decided to keep Dr. Dattilio on as a defense expert. Is that right?

A. Yes.

Q. Uh, what was Dr. Dattilio's area of expertise?

A. Um, so I'll answer this in two ways. We decided to keep him on because Mr. Davis was very keen, as I recall, and I, um, that we called Dr. Dattilio as a witness. We reviewed his report. He was a very well-known- is a very well-known expert in the area. Uh, he's a psychologist. I think he is a Harvard graduate. He has, um, immense, um, expert testimony experience. And his area of expertise in this particular case was on whether or not Mr. Davis was interested in minors sexually.

Q. So, um, did you consider replacing Dr. Dattilio with a

different expert in the same field?
A. I don't have a specific recollection about that, no.
Q. If- if you had, you could have sought to engage a different expert if you thought that someone else would have been significantly better for the defense than Dr. Dattilio on his subject matter.
A. We could have, although conversations with the defendant precluded us from doing that.
Q. Well, you say— I think you're referring to the testimony you just gave that Mr. Davis, uh, expressed to you his wish to keep Dr. Dattilio engaged on his behalf. Is that right?
A. Yes, and other things that he had disclosed to us.
Q. Right. But you— you didn't rely only on Mr. Davis's preference in your decision to keep Dr. Dattilio on, right?
A. Abso— absolutely not. He was a very well-known, well-experienced, um, expert.
Q. So in your view, he had— he had the experience, uh, and the qualifications to serve in the role for which he had been engaged, and for which you then re-engaged him, if you will.
A. Correct.
Q. Uh, ultimately, Dr. Dattilio prepared a written report, and— and, um, there's a binder, there should be a binder at the desk, and then after tab one, there's a copy of that report. I'll ask you to take a look at it, see if you rec— and then I'll ask you some questions about it.

A. Certainly. Excuse me. I see it. I have it in front of me.
Q. Okay. And is- does that appear to be the report that Dr. Dattilio prepared for Mr. Davis, initially referred by Mr. Heitzman, and then, uh, for you and Ms. Henry?
A. Yes.
Q. Um, so, um, after you became Mr. Davis's lawyer, but before you received a copy of that report, did you or Ms. Henry speak with Dr. Dattilio?
A. Yes. Both of us. I— I'm pretty confident that we had several calls with him together on speakerphone.
Q. So would it be fair to say that in deciding, uh, on the defense strategy and the kinds of witnesses you might call, you had to focus on— on what the evidence was going to be against Mr. Davis at the trial?
A. Certainly.
Q. And would it be fair to say that the principal body of evidence of the case consisted of the text messages that Mr. Davis exchanged with the person he thought had placed the ad?
A. That was the bulk of the evidence. Yes.
Q. Right. Um, so, was part of your reason for keeping Dr. Dattilio as an expert retained by the defense that you thought that some of the things that Dr. Dattilio had to say about Mr. Davis might be helpful to his defense at trial?
A. We did.
Q. Had you ever worked with Dr. Dattilio before?

A. Yes, several times.
Q. I'm sorry, how many?
A. Several times and many in my office had as well.
Q. Okay. And I think you mentioned that you had also engaged an expert by the name of Jeffrey Hancock.
A. Correct.
Q. What was his expertise?
A. He was, um, an expert in, um, internet communications, and we retained him to address some of the language that had been used in the text messages, whether, uh, that spoke to Mr. Davis's belief that he was speaking to someone who was pretending to be a 14-year-old or, who was actually an adult engaging in, in, um, sex talk, um, like child play, something like that.
Q. Did you and Ms. Henry engage Professor Hancock, or was he also engaged by prior counsel?
A. We engaged him.
Q. Do you remember that, at the trial, in the opening statement that the defense gave, I believe it was your colleague, Ms. Henry, who gave it?
A. She opened, yes.
Q. Yes. That the- the- the opening statement told the jury it could expect to hear from two expert witnesses, and those were Professor Hancock and Dr. Dattilio.
A. Correct.

Q. Okay. Um, with respect to Hancock, do you recall that the opening statement told the jury that they would hear about language patterns and about the website that Mr. Davis used, the Craigslist website?

A. Do I recall? I'm sorry, I missed the question.

Q. So, just on page 73, and I'm referring to the appendix pages, which are- I'm sorry? In tab- after tab 2. Thank you.

A. Okay.

Q. The lower right-hand corner, there are large, bold numbers. Those are the pages from the appellate appendix.

A. I see those.

Q. Those are the page numbers I'm going to be using. See on page 73, um, and I'm sorry, let me find the line. I don't have that handy... at line 16, do you see where the first full sentence reads, uh, "He's going to talk to you specifically about language patterns and about this particular website, Craigslist Casual Encounters."

A. Yes.

Q. So you said that, um, the opening statement said that Professor Hancock would testify that Casual Encounters is a place where strangers come to have anonymous sex with no strings attached. Do you see that?

A. Yes.

Q. Okay. Um, so, do you recall also that in the opening statement, Ms. Henry told the jury that Mr. Davis has no sexual

interest in children and had gone to the website looking for sex with an adult woman?
A. Correct.
Q. Right. Um, do you recall, uh, and this really was the theme of the defense throughout the trial, was it not?
A. Yes.
Q. And, um, in the open— in the opening statement, did Ms. Henry also tell the jury it would hear from a psychologist who had done a full psychosexual evaluation of Mr. Davis?
A. Yes, we intended to call him.
Q. So, and the psychologist that, to be clear, that Ms. Henry told the jury about was Dr. Dattilio.
A. That's exactly right.
Q. And, um, the opening, some of the testimony from Dr. Dattilio that Ms. Henry told the jury they would hear was that Alexander Davis has no prior history of any kind of conversation of this kind with minors.
A. Correct.
Q. Um, now, at the time Ms. Henry gave the opening statement, you understood that Dr. Dattilio had been allowed to give expert testimony. Is that right?
A. I believe that we were under the impression— I- I- my recollection is that, and I believe this is also in the record, that Attorney Davison had more issues with the testimony of Dr. Hancock, um, with respect to a Daubert hearing and— and whether

or not his testimony was relevant, admissible, et cetera, uh, than with Dr. Dattilio. That was my recollection.
Q. But— but, uh-
A. We did expect to call Dr. Dattilio to say essentially what he was saying in his report.
Q. You— you wanted to call him. That was—
A. Absolutely.
Q. And it's fair to say you wouldn't have told the jury about Dr. Dattilio if you thought there was a serious question about whether the court would allow you to call him.
A. Correct.
Q. So you thought you had been allowed by the court to call Dr. Dattilio.
A. Correct.
Q. At the time of the opening statements?
A. Yes. Can I explain why the Daubert hearing was mid-trial or-
Q. We're gonna get— we're gonna get there.
A. Okay. Very well.
Q. Thank you. Um, so, would you agree with me, at least in hindsight, as you sit here if you had known that, um, yeah, withdrawn. Um, so, let's go to the Daubert hearing, and after the prosecution called its last witness, but before the defense put on any witnesses, the court wound up holding a Daubert hearing to determine the admissibility of Dr. Dattilio's

potential testimony, right?
A. Correct.
Q. And that was held at the end of the trial day, is that right?
A. Yes, I— I can't remember. Whether it was after the first day of trial or the second, to be quite frank, but it was— we had already— the jury had been sworn, we opened, there was testimony, and it was very late in the day. The jury had been excused-
THE COURT: You can correct me. It appears as if the trial started on a Wednesday, and it was Thursday night on the Daubert hearing.
MS. MEEHAN: Th— that sounds right.
THE COURT: But do you know whether or not the government rested by then or not?
MS. MEEHAN: I don't recall, Your Honor.
THE COURT: And then there was some testimony that Mr. Davis and Mr. Hancock testified on Friday, and then there was a four-day hiatus. Do you remember that?
MS. MEEHAN: Yes, Your Honor.
THE COURT: Okay. So, we have set the stage a little better. Thursday evening after court, 5:00 or 6:00, I think.
MS. MEEHAN: It was after— it was around 5:00.
**BY MR. LEWIS:**
Q. That was September 28th, and Judge Smith said, "We do need

to have a hearing outside the presence with respect to the two experts." Do you remember him saying that?
A. Yes. Certainly, yes. We'd been waiting.
Q. And when he said that, were you surprised that he needed to have a hearing with respect to, well, Dr. Dattilio in particular?
A. No, I— I— I didn't read the trial transcript in preparation for today. My recollection is that we did have pre-trial motions in Philadelphia prior to jury selection; I thought at that time we had addressed a good bit of both of the experts. Um, there was a lot of pre-trial litigation, but we knew that day- I do remember that we were waiting for Dr. Dattilio. He was testifying in Northampton County, which was up the road a bit, maybe 15 or 20 minutes from the Easton Courthouse, and that we were waiting for him to finish his testimony for this hearing, for the Daubert hearing. I— it— I felt like it was almost a continuation of what we had started in pretrial litigation, but I— I can't recall specifically.
Q. So, sort of on the subject as to whether you were surprised that this Daubert hearing was now being requested or ordered by Judge Smith, I'm going to refer you to page 332 of the appendix, um-
A. I'm— I'm-
Q. And I'm going to refer you to a— a line, um, line 12. Uh, so, just to sort of let you read all of this in context, it's

on the— on the previous page, um, on that line, uh, 16, Judge Smith says, uh, "We do need to have a hearing outside the presence with respect to the two experts." Do you see that?
A. Yes.
Q. Um, and he notes that we have Dr. Dattilio here this evening. Do you see that?
A. Yes.
Q. Does that refresh your recollection that Dr. Dattilio was in the courtroom at this time?
A. Yes— he- he appeared in court after the jury had been excused for the hearing.
Q. Right. So, um, then do you see that Judge Smith said, "I don't know if counsel are prepared to proceed to take testimony from him, being Dattilio, outside the presence of the jury, or it's best, or whether it's best to wait until he returns tomorrow morning, or you're just so tired you just want to get home and get some sleep." You see all of that?
A. Is this on page-
Q. 331.
A. 332.
Q. That's all- that's a continuation of Judge Smith's remarks.
A. Oh, I see on 331. Yes, I see it.
Q. Right.
A. Yes.
Q. So did you understand from that that Judge Smith was

offering to allow the Daubert hearing to take place the following day if anybody involved was tired or if he wasn't yet prepared for Daubert testimony?

A. It seems that way, yes.

Q. Right. But he wasn't prepared to give Daubert testimony, was he?

A. I disagree. Um-

Q. Did you— did you— okay. Did you prepare him— did you go over the questions that you would ask him at a Daubert hearing and that you expected the government or the court to ask him?

A. Yes.

Q. When did you do that?

A. Several weeks before the trial.

Q. Uh, and, um, now, um, do you see on page— I'm going to refer you to page 332, um, if this is after the judge has announced the Daubert hearing, do you see where you say, um, I'm starting on page, uh, line 10, first full sentence. "I was under the impression, Your Honor, that they, the government, had more difficulties with Professor Hancock's testimony than with Dr. Dattilio's. I thought the court had made a ruling already on the admissibility of Dr. Dattilio." Indicating, and, you know, so that— that issues went to, you know, waiting on admissibility. Do you see that?

A. Yes.

Q. Okay. So weren't you there telling the judge that you were

surprised by his wish to have a Daubert hearing, which is, after all, about admissibility, when you thought the judge had already ruled on admissibility?

A. Yes, evi- evidently. Um, I— I will say this about Judge Smith. He- no matter what time it was, no matter how many times you had gone back and forth, if you wished to offer some rebuttal, he would allow it. Um, that— that was just the way he ruled in his courtroom. Um, and I— my recollection is Mr. Davison wanted to revisit it because we had already litigated this, I thought, in Philadelphia before jury selection, and— and the court was allowing that, so that's what we did.

Q. Right. Would it be— Judge Smith asked you if people were tired and wanted to come back in the morning. Did you— did you ask, uh, before Dr. Dattilio took the stand whether he was tired and wanted to come back in the morning?

A. I don't remember, honestly. I— I don't recall. If he had said he was tired and wanted to come back, we would have done so. We would have made that request.

Q. Well, you wouldn't— you wouldn't expect him to— the court made those remarks to counsel. "I don't know if counsel are prepared to proceed." So, didn't you understand from that it was for counsel to respond to Judge Smith whether counsel was prepared to proceed with Dr. Dattilio?

A. I assumed the court meant, "Are you prepared for the hearing?" And we had already spoken to Dr. Dattilio on several

occasions. And Dr. Dattilio is a very confident, um, individual with a— a wealth of experience. And prior to trial, neither Ms. Henry nor I had any doubts about his capability as an expert witness in testifying because of his vast amounts of experience. Um, he was in demand. Part of the problem was he was extremely busy. He was out of state, many times testifying elsewhere. That was another issue, was, uh, trying to get a trial date that was convenient for Dr. Dattilio's schedule.

Q. And your confidence in his ability to assist the defense was also informed by the questions you had asked Dr. Dattilio and the answers that he gave you, uh, about whether or not, in his opinion, Mr. Davis was sexually attracted to children. Is that fair to say?

A. Correct. Yes.

Q. Um, but wh— why was Dr. Dattilio in the courtroom that evening?

A. I'm not sure what you mean.

Q. Well, you assumed he came to the courtroom because you and Ms. Henry told him that he should go there.

A. Oh, yes, because I— I imagine, or I don't have a specific recollection about this, but that we were advised that this was going to be, um, revisited by the court and that he was going to be, uh, he was needed to testify. So I— I imagine— I'm sure that we called him that day and asked him to come to Easton, and we waited for him. I do recall it was at the end of the day

because he had been testifying, and I think he said it in his testimony, he had been testifying in Northampton County on a murder trial since 8:30 in the morning.
Q. Ms. Meehan, didn't you ask Dr. Dattilio to come to the courtroom because you wanted to meet with him that night, and you thought he would be testifying the following day, that is, tomorrow?
A. That's— that's possible. Yes.
Q. Right. So you're not really sure, are you, that Judge Smith told you in advance he was going to revisit admissibility and have a Daubert hearing? Are you?
A. I'm not positive that's my recollection, but I— I'm not 100% certain. No.
Q. That might not have happened. This might have been the first time you heard from Judge Smith that he wanted to do a Daubert hearing with respect to, uh, Dr. Dattilio.
A. It's possible, yes.
Q. I mean, when before this evening was the last time you had had a substantive conversation with Dr. Dattilio about his testimony on this case?
A. I don't know the exact date. It would have been a week or two before. I did have, um, notes that I had taken during our conversation about his credentials, his experience, um, for the voir dire portion of it, and some of the questions that we anticipated being asked, that he would be asked.

Q. Okay. I'm gonna— I'm gonna ask you to look at page 371 of the appendix, and I'm going to just, uh, read a couple of lines for you and ask if that refreshes your recollection about whether you expected testimony to be given by Dr. Dattilio that day and why he was there. And I'm gonna direct your attention to lines, uh, 8 through 10. Do you see that?

A. Correct.

Q. So Mr. Davison asked with regard to Dr. Dattilio, "Was he coming here today to testify?" And your colleague, Ms. Henry, answered, "No. He was coming by tonight to meet with us, and we were testifying tomorrow." So does that refresh your recollection as to whether you expected, uh, another Daubert hearing?

A. I— I think he was being called to testify as a defense witness, not for a Daubert hearing in the morning.

Q. Right.

A. For the following day.

Q. You didn't expect a Daubert hearing because you didn't expect him to testify that night, and you expected him to testify at the trial the following day. Is that right?

A. It- it looks that way. At some point, we became aware, obviously, that the court wished to hear more testimony. But I don't know how far in advance of his arrival in the courtroom that occurred.

Q. Maybe it wasn't in advance of his arrival in the courtroom.

Is that possible?

A. It's possible.

Q. I think you answered earlier, but you didn't— you didn't have any conversation with Dr. Dattilio to determine if he was tired and could benefit from a night's sleep before having to answer questions at the Daubert hearing.

A. I don't remember, but I— I can say with assurance that if that were— that was his wish and he expressed that to us, then we would have asked the court if we could adjourn for the day and resume in the morning.

Q. Um, do you remember that it was, um, the perception of the court that Dr. Dattilio was unprepared? Um, do you remember that?

MR. DAVISON: I'm going to object to the characterization. I think-

THE COURT: Objection sustained. Rephrase the question.

**BY MR. LEWIS:**

Q. Sure. Um, I'm going to ask you to take a look again at page 371 of the transcripts and, uh, you see line 18, the court is talking to Mr. Davison there. Judge Smith says, "You got him," referring to Dattilio, "before he had an opportunity to be prepped." And the court says "it makes for a very effective, you know," meaning examination.

A. I see it.

Q. You see that?
A. Yes.
Q. Right. So do you see— so, uh, was, in your view, Judge Smith wrong, uh, in stating his observation that it appeared, from the way the hearing went, that Dr. Dattilio had not been prepped? And just to rephrase it, it didn't seem to Judge Smith like Dr. Dattilio had been prepped for a Daubert.
A. Th— that may be so, but that was not the case.
Q. So, um, had he— had he testified, is it your understanding that Dr. Dattilio would have been allowed to testify that Mr. Davis neither displays nor tests for deviant sexual arousal patterns toward underage females?
MR. DAVISON: I'm just going to object to the char— underage needs to be defined, especially if this is a state case first. The entire argument is, what age?
MR. LEWIS: These are Judge Smith's words. It's on page 337-338 of the appendix.
MR. DAVISON: Well, then the witness should be presented that it was the judge's words at a specific time.
THE COURT: 337?
MR. LEWIS: Yeah, that's what I asked.
THE COURT: All right, granted.
**BY MR. LEWIS:**
A. I think at the beginning of the hearing, that was what we believed, uh, would be admissible, but by the end of the

hearing, the court was questioning the relevance and the utility of both the report and- and of Dr. Dattilio.

Q. But the court didn't— the court, at the conclusion of the Daubert hearing, allowed the defense to call Dr. Dattilio for certain purposes, right?

A. For- for certain purposes.

Q. Okay. And the court allowed, uh, the defense to have Dattilio testify that Davis is, quote, "not a pedophile, nor does he have an interest in children." Is that right?

A. I believe so.

Q. Okay. And in— when Dr. Dattilio said that Mr. Davis was not a pedophile, based on your meetings with Dr. Dattilio, was Dr. Dattilio, in your mind, limiting his definition of pedophile to 13 and under, or was he using a broader definition of that term?

A. We always assumed it was the broader term, as he testified to. Um, we made no distinction, and he made no distinction between hebephilia and pedophilia.

Q. So Dr.- Dr. Dattilio would have testified, if asked, that Mr. Davis does not suffer from hebephilia or sexual attraction to children around the age of 14.

A. I'm not sure that that was what the court's ruling was. Um, I-

Q. Well, the ruling will stand for itself, but if— but if— but if asked, Dr. Dattilio would have given his opinion, would he

not have, that Mr. Davis is not sexually attracted to 14-year-olds?

MR. DAVISON: I— I think the court ruling is in conflict with the exact question, and I think counsel is trying to state that, so I— I don't know if that question is answerable in its current form.

MR. LEWIS: I— I disagree that the court's ruling is being characterized correctly to the witness, but I'm not asking the witness what the court ruled. What the court ruled is in the record; I'm asking the witness because I disagree with the way that the court's ruling has been characterized, but it'll speak for itself. I'm— I'm based on— but I'm asking the witness, based on her interaction with Dr. Dattilio, if allowed, whether he would have testified that Mr. Davis is not sexually attracted to 14-year-olds.

THE COURT: I think you need to be more specific based on the actual ruling of the court.

MR. LEWIS: Well, um, if you give me a minute, I will, um, find some more, uh, language expressing the ruling.

MS. WHITE: Page 416. [Inaudible]

**BY MR. LEWIS:**

Q. So, um, gonna refer you to page 416 of the appendix and refer— refer you— sorry? [inaudible] I'm sorry; this is all, again, within tab 3.

A. Okay.

Q. And on line 4, you say to Judge, "He can say," referring to Dattilio, "based on my testing, he does not test for a sexual interest in minors, and here is why." Do you see that?
A. Yes.
Q. And do you see that the court said "Right"? The first word, right. So, was it your understanding from that that Judge Smith had allowed you to call Dr. Dattilio to testify that Mr. Davis, uh, uh, did not have a sexual interest in minors?
A. Yes.
Q. And when the court used the word "minors," he wasn't, in your understanding, referring only to 13-year-olds and under, right?
A. No, but that— that was part of the problem with Dr. Dattilio.
Q. Well, um, you say, "I'm not sure Dr. Dattilio's opinion was that Mr. Davis was not sexually attracted to minors, including 14-year-olds," right?
A. Yes, but he— he imploded, for lack of a better term, during the Daubert hearing, under oath, and his testimony was— would undermine our case because he confused or wasn't specific enough in terminology in his report between the term pedophile or pedophilia, referring to any minors, I'm sorry, under 13, I think it is, and hebephilia, and the victim, the alleged victim, who was, um, the agent pretending to be, uh, a teenager, was 14, so when he testified, Dr. Dattilio, it was

abundantly clear that his testimony was falling apart at the seams during the Daubert hearing because of that lack of distinction in his report.

Q. Well, putting aside his report, he was going to be able to take the witness stand and give testimony in Judge Smith's words that Alexander Davis does not test for sexual interest in minors, which would include 14-year-olds.

A. Correct. We wanted to call him. We intended to call him. However, on cross-examination, and if he wasn't subject to cross-examination, he would have been just fine. But he was a terrible witness during the Daubert hearing for Mr. Davis, in our opinion.

Q. So, how did you try, um, you could have tried to clarify Dr. Dattilio's testimony by preparing him to be clearer at the trial about his use of the— of the words like pedophilia, right?

A. I think that we had talked to him, and he— I don't know if you've ever dealt with Dr. Dattilio or met him. He's an extremely confident, um, cocky individual and difficult to prepare because he wants to cut to the chase and he knows what he's saying and what he's doing and he'll be fine and read his report and, um, in hindsight, um, we should have been probably, um, Ms. Henry, Judge Henry *(sic)* and I should have been, uh, more assertive with him and aggressive in preparation, um, but he is the expert in this area, we are not. And so, and he's a

very experienced expert. I think even Judge Smith had referred to that in the transcript. He's, um, he has a tremendous amount of experience. And, um, in hindsight, I think we should have been more aggressive and had him break down the terminology. But it didn't seem necessary because he didn't, um, raise it as a necessity in the case. Despite knowing the victim was 14— the alleged victim was 14.

Q. Um, so dur- during the Daubert hearing, you acknowledged that Dattilio's testimony would redress the testimony from the defendant that you anticipated, right?

A. Yes, we- we hoped it- it would, certainly.

Q. And so your plan to call Dr. Dattilio was a factor in you and Mr. Davis together deciding whether he should testify?

A. In Ms. Henry, myself, Mr. Davis, um, yes, all of us. And- and I will also add there were two other individuals at counsel table with us: the research and writing attorney, who did not meet with Mr. Davis in person, if I recall, but who was, um, assigned to the case doing pre-trial litigation and so forth; and a student intern from Temple University, who also sat with us at counsel table and was part of the trial team.

Q. So even before the Daubert hearing, you understood that the court had placed certain limits on the scope of Dr. Dattilio's testimony.

A. I don't recall the specif- yes. Generally, yes. I don't recall the specific limitations, but it was still our intention

to call him despite the limitations.
Q. Okay. Um, so, uh, I'm just gonna refer you to page 343 of the appendix, where Judge, uh, Smith, uh, says, "The defense"- this is on line 19.
A. Sorry. I'm getting there. I have it.
Q. "The defense should be able to call their expert to say, 'Yes, he's a sex addict, but there's a difference between a sex addict and a pedophile,' and I think that seems appropriate. He would know what a sex addict is and be able to distinguish a sex addict from a pedophile." You see that?
A. Yes.
Q. Okay. And, um, the court also said, and I'm looking for this now, "Dr. Dattilio will be testifying about that Mr. Davis has no sexual arousal patterns toward children; he's not a pedophile; he's basically had no interest in children in a sexual way, based on his evaluation of Mr. Davis; basically that he's not interested in children sexually." That was the court's ruling even before you got to the Daubert hearing, right?
A. That was my understanding, yes.
Q. Right. And that didn't significantly change, did it?
A. What changed was Dr. Dattilio's actual testimony and his presentation as a witness.
Q. All right. I'm gonna bring— I'm gonna distinguish between these two things: the scope of his permitted testimony and your

evaluation of his performance at the hearing. So right now, in my questions, I'm not asking you for your evaluation.

A. Very well.

Q. I'm asking you whether Judge Smith, as a result of the Daubert hearing, substantially narrowed the permitted scope of Dr. Dattilio's testimony from his previous ruling.

A. No, I don't believe so.

Q. Did you have a meeting with Dr. Dattilio between his Daubert hearing testimony and when the defense rested?

A. Can I— can I explain my recollection?

Q. Do you know? Do— do— do you remember-

A. We spoke to him.

Q. -if you did or not?

A. Yes.

Q. Did you— did you meet with him in person?

A. I believe after he left the stand, my recollection is that we told him that he was- he did not need to return in the morning, that we would not be calling him. We made an immediate— almost immediate— decision, the four of us together. And then, Dr. Dattilio called either Ms. Henry's cell phone or my cell phone that night to apologize.

Q. So your testimony today is that, as of the night after the Daubert hearing, you had already made a decision that you were not calling him as a trial witness.

A. Correct. Right after the Daubert hearing. That's right.

Q. So, um, the next day, didn't you tell Judge Smith you were still planning to call Dr. Dattilio?
A. I don't recall that. If— if it's in the transcript, then we did.
Q. Okay. I'm gonna refer you to page 404, uh, where you told Judge Smith that you, quote, "built your defense on this." Uh, and I'll find the line for you in a second. Just for the record, page 404, uh, is the transcript; it's after tab 3, uh, and this is, um, September 28th. And, uh, and then you said, uh, to the court on line six, do you see? "If the court feels more comfortable with Mr. Davis testifying before Dr. Dattilio, we will do so," um, and so you were telling Judge Smith right then and there that Dr. Dattilio was still testifying. Is that right?
A. I'm assuming this is after the Daubert hearing. I'm not— I'm not clear on that, but if you say-
Q. It- it is.
A. Okay. Um.
Q. So, and then you see on page- on line 18 of that same page 404, saying that you're going to ask Dr. Dattilio to come back Wednesday morning? That's, uh, five days later. Four days later? Five days later, yes.
A. Okay.
Q. Uh, it's difficult for him, but he's going to arrange his schedule. Uh, he should be allowed to testify to the majority,

if not all, of his report. Do you see that?
A. Mm-hmm.
Q. So, and do you see on page 412 that you- you emphasized to Judge Smith that you had opened on Dr. Dattilio's testimony and that it was important? And I'm going to refer you to line, um, 18. "So that's in the jury's mind that they're expecting to hear from Dr. Dattilio. So if Your Honor precludes him from testifying-" you see that?
A. Where Ms. Henry is speaking? Yes.
Q. Yes.
A. That's Ms. Henry, not me.
Q. Yes. So, by the defense making the point to Judge Smith that the defense had opened on Dr. Dattilio testifying, you were telling the court you still wanted to call Dr. Dattilio because you had opened on him, among other reasons, right?
A. If we were still debating about calling him, I— I assume we were; we wouldn't misrepresent anything to the court, and maybe we hadn't made the decision as early as I— I stated. This was in 2018; it's 2025. I've had numerous cases in trial since then, to be candid. But my recollection is that, um, on balance, we felt that Dr. Dattilio, we as a group, the four of us, but in particular Ms. Henry and I, and Ms. Henry has an equal, if not greater, trial expe- amount of trial experience, felt that he had done so poorly during the Daubert hearing, um, that in weighing it, he— he could not possibly be rehabilitated

in front of the jury.
Q. You— you say he did poorly, and am I correct that the way in which he did poorly was in his lack of clarity about pedophilia as applied to Mr. Davis? Is that right?
A. Part- a portion of it, yes, yes.
Q. Was that the most important, uh, in your mind, problem with how the Daubert testimony went?
A. No.
Q. What— what was?
A. Equally important was that, on cross, he acknowledged that the majority of his conclusions stemmed from Mr. Davis's interviews themselves. The interviews he had with Mr. Davis— 80, I— I forget the percentage he said— it was north of 75%, something like that. And then the remaining, um, evidence that he used for his conclusion were family members.
Q. But you knew that Dr. Dattilio had done far more to reach his conclusions about Mr. Davis than talk to him and his family members, right?
A. It— yes, I did. It did not come across that way when he was testifying.
Q. Right. But he wasn't prepared for the specific questions that he was asked at the Daubert hearing that, you know, culminated in his answering the questions in the way he did.
A. I'm not sure if it was a lack of preparation or that he was too exhausted.

Q. You're not— you're not sure because he never went over that testimony again with Dr. Dattilio.

A. Not from the prior time that we spoke to him, which I believe was a week or two before the Daubert hearing.

Q. Right. You didn't explore with Dr. Dattilio how he could be clearer and more beneficial to Mr. Davis at the trial.

A. I don't recall doing so, no.

Q. So when you— when you left court on Friday, you had asked Dr. Dattilio, after you had gotten the ruling from the court, to come back to court to testify on Wednesday. Is that right?

A. It sounds like that's correct, yeah.

Q. So just— it's on page 404.

A. Yes. Yes.

Q. Uh, "we could present some of our witnesses, including Mr. Davis, and ask Dr. Dattilio to come back Wednesday morning. It's difficult for him, but he's going to try to rearrange his schedule."

A. Yes.

Q. So, at the time that Mr. Davis testified, you hadn't told him that you weren't calling Dr. Dattilio, or Ms. Henry hadn't told him that, right?

A. I don't recall. I— my recollection is that Dr. Dattilio was terrible, beyond terrible on the witness stand, and— and I think that's reflected in Judge Smith's comments, and that we may have, if I recall, we had a coun— we had a discussion at

counsel table. I don't recall whether it was that evening; it was very late at that point. It was 6:30 or 7:00. I'm sure the marshals wanted to take Mr. Davis back, um, so it may have been later that week, um, that we talked to him and said, "This is a real problem for us," calling Dr. Dattilio after the disaster he was on the stand.

Q. Well, as of Friday night, when you broke for the week, um, and this was after Mr. Davis had testified, you were still telling the court that Dr. Dattilio would be coming back to court on Wednesday, right?

THE COURT: Is this— this 404 isn't the end of the day Friday, is it?

MR. LEWIS: Uh, well, now we're going to page 546. This is— this is at the end of the day on Friday. This is after, uh, a lot of the testimony. This is in the afternoon. I'm sorry. This is after Mr. Davis—

THE COURT: 546?

MR. LEWIS: Yes.

**BY MR. LEWIS:**

Q. Um, so, um, so you say, uh, you say, uh, it's line 22, um, "We're not gonna have Dr. Dattilio until next week. Nine sharp on Wednesday, Dr. Dattilio can be here. That's our last witness." That's Ms. Henry. And, in fact, Dr. Dattilio came to court on Wednesday, didn't he?

A. I— I— that sounds right, yes.

Q. Right. So, does all of that refresh your recollection that as of the time that you called Mr. Davis to the witness stand, you hadn't told him that you were not calling Dr. Dattilio?

A. I'm not sure that we had made a final— but clearly, we hadn't made a final decision. I— because I assure you, we would not have misled the court. We must have been still debating, and I— I just don't know the answer to that. But I know that Mr. Davis was part and parcel— Ms. Henry was in the first seat, I was in the second seat, Mr. Davis was next to me, then it was Ms. Herman and Mr. O'Donnell, the Temple intern. So he was— we were all talking the entire trial, strategizing, and he was part of that, uh, communication. So, if we were hesitant, I am certain we included him in our discussions about our hesitancy, not necessarily that we were not going to call Dr. Dattilio.

Q. So, did you make any changes with Mr. Davis to his, um, to the— to the questions you were going to ask him at trial and the answers you thought you were going to get from him, uh, based on a changed expectation as to whether you'd have Dr. Dattilio corroborating his testimony afterwards?

A. He would still testify that he wasn't interested in minors and that he spo- he thought he was speaking to an adult on the— on these Internet text message communications. Um, I'm not sure- Dr. Dattilio's purpose was to, as you said, bolster Mr. Davis's credibility. I don't recall making any changes, and I recall Mr. Davis being pretty adamant that he wished to

testify. And there were also some issues, evidentiary issues, in the case regarding statements he made that had to be rebutted, and he was the only person, really, apart from cross-examination of Agent Block, who could rebut statements that he had been— that— that he had made according to the government.

Q. But in any event, Mr. Davis and the defense made the decision for him to testify in connection with the decision to have Dr. Dattilio testify.

A. I think whether or not Dr. Dattilio or any doctor was going to testify, Mr. Davis was going to take the stand.

Q. But in your view, Dr. Dattilio's testimony was going to be important to whether the jury or not credited Mr. Davis's testimony.

A. It— it appeared that way when we were preparing for trial. It— it did not appear that way after he testified during the Daubert hearing.

Q. Did you ever say to Mr. Davis, "Maybe you shouldn't testify because now we— we're thinking we're not gonna call Dr. Dattilio," or any words to that effect?

A. I am certain that we had a discussion about him testifying. My recollection, and again, this is going back to 2018, my recollection is that he adamantly wished to testify regardless of what witnesses we were calling.

Q. Right. But you didn't make any changes to the testimony script you had prepared in advance based on what happened at

the Daubert hearing?

A. I don't know that we had a script. We— we reviewed his—

Q. Did you write down the questions you were going to ask him?

A. We reviewed with him, sure.

Q. Right. And you— didn't you give him an opportunity to answer those questions so that you could then modify the questions you were going to ask based on his answers?

A. I don't recall modifying our questions. Um, we may have had questions in there related to Dr. Dattilio's testing of him; I'm not sure that would have even been admissible. I— I'm— I don't recall, but we met with him innumerable times in the prison. Many, many, many times.

Q. So, Mr. Davis planned to testify and did testify that he's not sexually interested in minors, including 14-year-olds, right?

A. Yes.

Q. And the defense strategy was that that testimony, together with expert testimony from Dr. Dattilio, that, in his opinion, Davis is not sexually attracted to minors, made it more likely the jury was going to credit Mr. Davis's all-important testimony.

A. In our beginning trial theory, yes, that's correct.

Q. And you didn't make any changes to the questions you asked Mr. Davis based on what happened at the Daubert hearing?

A. If we did, I don't recall. We may or may not have. I just

don't specifically recall.
Q. Right. If you could have had Mr. Davis, in the questions, you asked him, elaborate more than he did on, uh, on his explanation of lack of interest, lack of sexual interest in children, if you had known that Dr. Dattilio wasn't going to be there to back him up on that.
A. No, we could not have.
Q. You- you couldn't have asked him any more questions than the-
A. No.
Q. -limited questions that you asked him?
A. No.
Q. And why is that?
A. Based on conversations he had had with us in the prison at the FDC.
Q. So, you're— you're aware that Mr. Davis's, um, devices were examined for child pornography?
A. Not all of them.
Q. Dr. Dattilio was prepared to testify that he saw no evidence that Mr. Davis had an interest in child pornography.
A. He was prepared to say that, yes.
Q. And had you called him on Wednesday, he would have given that testimony?
A. Yes.
MR. LEWIS: Nothing further. Thank you.

THE COURT: I think at this time we're going to take our lunch break. Uh, we're going to break for an hour— try to keep it to an hour, come back, and resume the testimony then. Court's in recess.

MS. MEEHAN: Thank you, Your Honor.

BAILIFF: All rise.

MR. LEWIS: Your Honor, can Mr. Davis be excused for the afternoon?

THE COURT: He may be excused, yes.

MR. LEWIS: Thank you.

(Recess at 12:20 p.m., until 1:10 p.m.)

BAILIFF: All rise. Court is now in session.

THE COURT: Thank you. You may be seated. Let the record reflect counselor present. The defendant is present. The witness has returned to the witness stand. And, uh, we are prepared to proceed with cross-examination.

MR. DAVISON: Thank you, Your Honor.

THE COURT: Mr. Davison, you have the floor.

MR. DAVISON: Thank you.

**CROSS EXAMINATION**

**BY MR. DAVISON:**

Q. Um, Ms. Meehan, uh, good afternoon.

A. Good afternoon.

Q. Uh, from the outset, the defense strategy was the defense of entrapment, right?

A. Part of it, yes.
Q. Okay, but when you opened, um, or an opening statement, it— that strategy was clear?
A. Yes.
Q. And in order to get the instruction on that affirmative defense, um, was it your understanding that the defendant was going to testify?
A. Yes.
Q. And that, absent unusual circumstances, his testimony would be needed in order to get that instruction to the jury?
A. Normally that's true, and in this case, yes, that's correct.
Q. And you did open, indicating to the jury that you'd be presenting two experts, right?
A. Yes.
Q. Dr. Hancock, who I believe was an ex— er, deemed an expert in the psychology of online communications. Does that sound right?
A. Yes.
THE COURT: Technically, for the record, Ms. Henry.
MR. DAVISON: Oh, I'm sorry. I meant the defense. I'll be more clear.

**BY MR. DAVISON:**

Q. Um, and, uh, it was your joint strategy, right?
A. Yes, Catherine Henry and I were equal trial partners.

Q. Okay, and there's nothing one did that the other didn't, uh, at some point agree was the proper line of defense. Is that fair to say?

A. Absolutely.

Q. Um, and the other, uh, expert was Dr. Dattilio, as— as you've already discussed. Um, whose idea was it to procure Dr. Hancock?

A. It may have been Catherine Henry's.

Q. Okay, and, uh, do you recall how he came to your joint attention?

A. I think we were all researching, including our research and writing attorney, Jennifer Herman; we were all researching, um, internet communication, um, because the defense, in part, was that, um, Mr. Davis was on Craigslist looking for sex. He admitted to being a sex addict and role-playing. And we after doing some research, this is my recollection. I— I'm— it's going back to 2018 or 20— early 2018, so I'm not 100% certain, but my recollection is we did research on Internet communication, um, Craigslist want ads for sex, soliciting sex on Craigslist, and so forth, and Dr. Hancock was an expert in that sort of communication.

Q. Okay, and he was a professor at Stanford at the time, right?

A. Correct. He— he was in California, yes.

Q. And I assume you flew him in on the defense's dime.

A. We did, yes.
Q. The government— uh, myself in this case— I objected to both experts, um, with regard to their testimony and, once Judge Smith allowed, also as to the scope. Is that fair to say?
A. That's my recollection. Moreso with Dr. Hancock. I think the government, you, as, uh, government counsel, did not object to Dr. Dattilio's qualifications as an expert.
Q. Right, right. I— uh, that's correct. The government did not object to their qualifications. The government was objecting that their testimony was essentially usurping the jury's, um, ability to determination the credibility of the defendant if he were to testify and perhaps substituting their opinions for the defendant. Is that— would that be fair— that that was the crux of the government's objection to both experts?
A. As I recall, yes, we went back and forth, back and forth, pre-trial and during trial as well.
Q. Okay, so even after Judge Smith may have made some allusions before or during voir dire, when we had breaks and discussed Dr. Dattilio's, um, potential testimony, um, was it your understanding that the scope of what Dr. Tilio— Dr. Dattilio could testify to was fully laid out at that time during voir dire?
A. I honestly, I don't recall. My recollection is that we litigated pre-trial motions before jury selection in a courtroom in Philadelphia, and then I— I'm assuming the

government asked to revisit the issue of Dr. Dattilio, which is what led to another hearing wherein Dr. Dattilio testified late in the evening after the jury had been dismissed during trial. That's my recollection.
Q. And do you recall at this pre-testimony stage during voir dire in Philadelphia that the government indicated that it wanted each of those experts to be presented in a Daubert hearing to at least understand what the scope of their testimony could and would be?
A. Yes.
Q. And that Daubert hearing did not take place in Philadelphia, correct?
A. Neither witness was in Philadelphia, correct.
Q. Okay, and the Daubert hearing for both Dr. Hancock and Dr. Dattilio occurred in Easton mid-trial.
A. Correct.
Q. You indicated that you had prepared Dr. Dattilio several weeks before trial. Do you recall approximately how long you met with him during that time?
A. I don't recall meeting with him in person. My recollection is that Ms. Henry and I and Ms. Herman may have been present because it was really a collaborative effort on the trial team part. Um, I believe we spoke with him on the phone. He- my recollection is he is an exceedingly busy man and was very confident and would say, "I know what I'm doing. I know how to

testify." Um, so it was not lengthy. Um, I do recall him giving us the— the lay of the land for the voir dire questions based on his education and his experience and so forth. It may have been under an hour.

Q. Okay, and in his own report, and you can look at tab one submitted by the defense, it indicates, uh, the materials that Dr. Dattilio reviewed, right? Some ten-plus items in bullet points.

A. On page two?

Q. Correct.

A. Yes.

Q. And do you recall— or have any— well, do you recall him indicating at these prep sessions that he had reviewed these items?

A. I don't have a specific recollection, but I'm sure we would have asked him based on having called experts in the past, and-

Q. That's something you would have asked.

A. Absolutely.

Q. And if he had said no, that would have been something to spark your attention, right?

A. Correct.

Q. And that would have, perhaps, sparked a follow-up on your behalf to say, "Please review those materials."

A. Yes, if he didn't have them, we would have sent them and would have queried whether or not there were any changes or

additions to his report, um, and if he did have them, I'm- I'm sure that he said he would be prepared for testimony at trial and would review things again as well. I'm certain he said that.

Q. Okay, and again, that was weeks before, uh, his Daubert hearing.

A. Yes, we were going back and forth about scheduling for a period of months. Because he was very much in demand, and again, he traveled out of state or traveled at that time, he was traveling out of state very often as an expert witness, so it was very hard to get a trial date that corresponded with his busy schedule.

Q. And at the Daubert hearing, it became clear that Dr. Dattilio was not so familiar with those items that he indicated in his report on page two that he reviewed.

A. Unfortunately, yes.

Q. Yes, he was not familiar with that.

A. He was unfamiliar or had forgotten. My recollection is he testified that he reviewed them. They were not fresh in his mind when he was testifying.

Q. And, in fact, during his testimony at the Daubert hearing, when he claimed that the defendant did not present as a pedophile, or he concluded that he was not a pedophile, he was relying on materials in his testimony that he did not indicate he was relying on in his report. Is that fair to say?

A. That's generally my recollection. I— I had a— we were left with that impression, but— but also that the terminal— the specific terminology that would have helped our defense and would have buttressed- buttressed, uh, sorry, bolstered, Mr. Davis's testimony, um, was undermined by the fact that he misused or wasn't specific enough in his report with terminology.

Q. We'll get to that in a moment, but in his Daubert testimony, did he rely on his belief in the defendant, uh, because of the, um, fact that he claimed that the answering machine for which the defendant called when he was trying to get in touch with this fictitious girl had the voice of an adult woman?

A. Oh, yes, yes.

Q. Okay, and that was not articulated in Dr. Dattilio's report, right?

A. I— I haven't read the report recently. If— if it's not in there, then it's not in there.

Q. Okay.

A. But that was a fact that we— that Mr. Davis had told us, and— and I know that that was shared with Dr. Dattilio.

Q. Did Dr. Dattilio also indicate that his opinion was bolstered by a polygraph examination that the defendant had taken at the Daubert hearing?

A. Um, he testified that he— he was aware that Mr. Davis had—

had passed a polygraph, and I think he backtracked on whether that bolstered his conclusions or not.

Q. And he backtracked because, well, we don't know, but, well, I'll rephrase. The polygraph is not, and if you look at materials reviewed on page two, the polygraph examination is not one of those. Is that fair to say?

A. Correct. I— I don't think he was aware of the polygraph when he did his report. We— we did— we had nothing to do with the polygraph. Uh, the defense team: Ms. Henry, myself, and the others in my office.

Q. Okay, who administered the polygraph?

A. I do not know the answer to that.

Q. Was it someone in your office?

A. No.

Q. Okay, was it— could it have been someone in Mr. Heitzman's office or at agency to Mr. Heitzman who may— may have requested it?

A. It may have been.

Q. Okay, but this was news to you when Dr. Dattilio, on the stand at the Daubert hearing, indicated that he believed— he was more likely to believe the defendant because he had passed his polygraph?

A. It— it wasn't news that Mr. Davis had taken and passed a polygraph, but we didn't— I don't recall— I— I genuinely don't recall having the examination, the results, or anything of that

nature with respect to the polygraph.

Q. Okay. Uh, with regard to the term "pedophile" and how Dr. Dattilio used it in his report and his testimony, um, testimony on that issue at the Daubert hearing, was it problematic for Mr. Davis?

A. It was a disaster, his testimony, in our mi— and I'll say "our" because Ms. Henry, myself, Mr. O'Donnell, and, um, Ms. Herman were all co— we were all consistent about our opinion that he did very poorly on the stand.

Q. And is that because, in his report, Dr. Til— Dr. I'm so sorry, Dr. Dattilio, was emphatic, or unequivocal, that Mr. Davis was not a, quote, "pedophile," but not— but did not define that term, uh, as including minors between the ages of 14 and 18.

A. Yes, that was a problem because the alleged victim in the case was 14, which came to light in stark, um, very starkly during cross-examination, uh, during your cross-examination, to be frank.

Q. And is that because Dr. Dattilio looked at the photograph of the purported child in this case and noted that this child presented as post-pubescent?

A. I don't— I don't honestly remember if that was the reasoning. In my mind, it was that he's an expert, he's a— he's— he has a doctorate, I— I don't know whether it's from Harvard, but he had attended Harvard, and it was on him, as an

expert, who would be testifying before 12 non-experts, uh, to be as specific as possible to be relevant to the defense. And he mixed up the terminology.

Q. And when he answered the questions to indicate that, yes, I could— I, meaning Dr. Dattilio, could still find that Mr. Davis, or someone like him, is not attracted to minors 13 and below, that would not disqualify them from being attracted in a sexual way to minors 14 and up, right?

MR. LEWIS: Objection to the characterization of Dr. Dattilio's testimony-

THE COURT: Overruled. I think that's a very relevant question.

**BY MR. DAVISON:**

A. When I reviewed the transcript, my recollection, and, again, the transcript is what it is, he— he affirmatively answered on cross-examination that, yes, somebody who's not attracted to individuals 13 and under could be attracted to individuals older than that, that are minors.

Q. And because he answered that question in that way, on that topic, that rendered his opinion, rather at best, irrelevant to the facts in the criminal case against Davis.

A. It made his testimony less valuable, much less valuable— undermined; we were concerned it would undermine Mr. Davis because it would then put Miss— Dr. Dattilio's credibility and his report at issue in the minds of the jury, and they might be

overly focused on it. And it was a huge problem, yes.
Q. And was that in addition to the fact that Dr. Dattilio, as you mentioned on direct, also testified, uh, and I'm paraphrasing, that if what Alexander Davis told him during the course of the report is not true, that his own report, the doctor's report, was worthless?
A. He— he said something like that, and the judge reiterated that. Judge Smith said that toward the end of the testimony.
Q. Okay, and the answers to both of those questions, because they were done at a Daubert hearing, they're on the record, and counsel, myself, government counsel, was most certainly going to present those to him in front of a jury, right?
A. He was under oath, yes.
Q. So there was no way to rehabilitate Dr. Dattilio because those questions and answers were now in stone. Is that fair to say?
A. Well, we thought about how we could rehabilitate him, we discussed it. Um, but it was too late, in- in a sense, because he was on the record, he was under oath, and I'm not sure there was any explanation he could make the following day. As a fresh witness, with, um, sleep and rest, that would have cured the testimony from the day before or a few days before.
Q. Well, as counsel has alleged in— in his motion, why didn't you just put him up there anyway? What's to lose?
A. Well, to lose would be that the jury— he had no value at

that point because if the witness was 13— if, if the alleged victim had been 13 or years or younger, then Dr. Dattilio's waffling, as Judge Smith said, would have been less, um, of less importance. But the fact that his testimony spoke specifically to 13-year-olds and under, and less so about the age of the alleged victim, the value of it was, was nothing, really. And he was a— he was a terrible witness. I think what's difficult to see in the transcript that we all felt in the courtroom was that he was very tired; he was rubbing his forehead a lot, he came across confused. So when we were watching that, it was very hard to visualize him being the expert that we used to know him to be, very confident and confident and capable. And it was hard to imagine him presenting that way to a jury and being cross-examined again the way he was and making it through that.

Q. Would you say he was a little bit rattled and embarrassed?

A. He was embarrassed. He called us and apologized.

Q. And- and would that present concerns for his testimony at trial?

A. Yes, absolutely.

Q. In what way?

A. Because it would put his credibility and his expertise- would reflect on on our credibility as trial counsel, Catherine Henry's and mine, because he— he came across poorly, and it would undermine, in our opinion; it would have undermined

rather than helped Mr. Davis. And the point of calling Dr. Dattilio was to help Mr. Davis's credibility with, uh, uh, a testing, a finding by an expert. And since he wasn't able to capably render that opinion, quite the opposite, frankly, um, we thought it best to, um, not call him at all.

Q. And did you already have an expert, um, who was going to testify to the fact that a reasonable person could read the text exchange between the defendant and the undercover and reasonable- reasonably believe that some exchanges were that- were of that from an adult as opposed to a child?

A. We had Dr. Hancock for that purpose.

Q. Okay. Did that at all factor in with your decision not to- decide not to call Dr. Dattilio at trial?

A. I don't have a specific recollection of the conversations. I imagine it did because we were looking holistically at the case and the defense and Mr. Davis's testimony, rebutting Agent Locke and some of the things that he had said on direct and cross. So I imagine it did, but I— I can't definitively say yes.

Q. And the timing of these decisions, is that clear in your mind?

A. I— not 100%. I— I feel like we were pretty s— here's what— here's what I'll say. It was a certainty that Dr. Dattilio was terrible— at the Daubert hearing. That we were crystal clear on. Whether or not we were able to rehabilitate him, whether or

not his report and/or his testimony had any utility, maybe we were still thinking about and debating. There was no debate about how bad a witness he was.

Q. Is it possible you were waiting to see how the defendant presented on direct and cross when he testified, to wait on that decision for Dr. Dattilio as opposed to your testimony on direct? Is that— is that possible?

A. It— it's possible. Normally, in a trial, we call the defendant last, um, but it's possible that we thought we could get some narrow— I just don't have a specific recollection— but if there was a way to call Dr. Dattilio that would aid our defense, aid Mr. Davis's testimony, and we could have it narrowly tailored, the scope of it, such that he wasn't subject to the amount of cross-examination that had taken place during the Daubert, we probably would have called him, but there was no way that we saw that to happen.

Q. Okay. And you testified about the fact that— and— and, well, good call. This was a judgment call, right?

A. It was a strategic call, yes.

Q. Um, there's no way to know at the time what the right decision is. Is that fair to say?

A. Well, I— yes, it's fair. There were four of us in the courtroom, some more experienced than others, four on the defense team, and we were collaborating all the time on everything, and all four of us felt the same way about how— how

poorly he did.
Q. Right. I'm not saying that— that that wasn't your decision, but in making such decisions, right, you never know how a juror's gonna react to either hearing Dr. Dattilio or not hearing Dr. Dattilio.
A. Correct. Correct. Just his-
Q. You're never gonna know— sorry— you're never going to know how a jury is going to respond to the fact that they heard it in opening, will they remember? Something like that. Was that part of your discussions?
A. Correct. I— I think it was— we did weigh the pros and cons. That I do remember. And we felt that the risk was too high. That saying in an opening, which is an argument— and they would get an ex— it wasn't evidence; rather, it's argument, and the jury would be instructed as such, we would have to rely on that in balancing whether it was too risky to call Dr. Dattilio or not.
Q. Okay, so that was specifically taken into account, the fact that you opened on Dr. Dattilio?
A. Yes.
Q. Um, where was the defendant at all in these discussions vis-à-vis, do we call Dr. Dattilio, do we not, if you remember?
A. I— I have- my- my memory is that Mr. Davis was at counsel table sandwiched between the four of us and was very involved, taking notes, writing things down, talking to us constantly

throughout the trial. I- I cannot imagine that we did not explain to him, if he didn't already see for himself, that it was just that Dr. Dattilio would be— would do more harm than good and that his testimony could damage Mr. Davis's. I know Mr. Davis was very fixated on the polygraph, which was not going to be— was not going to come out in evidence. So that point of calling Dr. Dattilio for that purpose of— of he passed a polygraph was never going to manifest.
Q. Did you ever have any discussions or explain to the defendant that Exhibit 1 in this proceeding, Dr. Dattilio's written report, would not be admissible in his trial?
A. I don't recall this specific conversation, but he saw— he saw us argue at the pretrial hearing; he- he saw the motions, the pretrial motions; we went back and forth with motions of admissibility and so forth, as I recall pretrial filings; and he saw the testimony, so, and he heard Judge Smith elaborate on the ruling that he— that he was making and so forth. So, whether we had a specific conversation about the admissibility of the report itself, I— I don't remember. We— we— if he asked, I'm sure we would have explained that, but-
Q. Was it your memory that Mr. Davis was involved as a- as an active participant, um, for his defense during the trial?
A. Absolutely.
Q. And can you expand on that? What— what do you mean when you say absolutely?

A. So he had strong opinions about, um, witnesses, about who to call, what to ask them. He took notes, as I mentioned, throughout the entire trial. He asked questions of us. Um, there was a lot of back-and-forth conversation during breaks. Um, his parents called us quite a bit. And, um, we called his wife, and that was at his suggestion and request, um, which we agreed with, obviously, because we did call her.
Q. When you say call, you mean call her as a witness?
A. As a witness, I apologize. Yes.
Q. That's fine. So, um, given what you described regarding his participation, the decision, I— I understand you don't remember, but would it be surprising to you that he, Mr. Davis, was not involved in the decision to call or not call Dr. Dattilio as a witness at trial?
A. He was involved. There's no— I— I— I'm sure he was involved, and I'm sure that if— when we made the decision not to call him, that Catherine and I explained to him the rationale for that, and it was our call as a strategy call to save the case, to save the defense, and not necessarily his call.
Q. And do you recall him objecting?
A. I don't recall specifically. I know that he really wanted Dr. Dattilio to testify. And I don't remember if he had that strong a feeling after the Daubert hearing or not. He probably did, um, but I don't have a specific recollection. But I know

that Catherine and I felt very strongly that it was not going to work out well for us— for Mr. Davis specifically.

Q. You were asked by counsel, uh, Mr. Lewis, uh, with regard to your questions to the defendant when he was testifying at trial, right?

A. Yes.

Q. You were asked, well, why didn't you ask the defendant if he was attracted to minors in the 14-year age range? Is that fair to say?

A. Yes.

Q. And what was your answer?

A. There were things that we had conversations about that he disclosed that it was not a question that should be asked.

Q. You were precluded as counsel from asking that question. Is that fair to say?

A. That's fair to say.

Q. And, in fact, there was testimony in the case, uh, from another Special Agent, uh, Barlow, uh, from the Attorney General's Office, who testified that on a cigarette break that he gave the defendant while in detention, the defendant stated to Agent Barlow that he had not been attracted to young girls or until he went to Kalahari Water Park and saw some in— saw them in bathing suits. Was that— that was evidence in the case, right?

A. Oh yes, I have a very specific memory of that.

Q. Okay, so you— and you, of course, knew that that was a problem for the defense.
A. Yes, because it— yes, it was not recorded, but that was in evidence because of the testimony. That was one of the reasons we called his wife as a witness, um, to— to rebut the fact that the family had ever gone to Kalahari Water Park.
Q. Right, meaning that that statement to Special Agent Barlow was not recorded on audio, right?
A. Correct. It was during a break outside.
THE COURT: So he did testify to that in the government's case in chief?
MS. MEEHAN: About the statement that Mr. Davis made?
THE COURT: Yeah.
MS. MEEHAN: Yes.
THE COURT: Okay, you weren't worried that, depending upon what he said, it would open the door, and they would call that and rebuttal? That was already in evidence.
MS. MEEHAN: That was in evidence. It's— it's my recollection, Your Honor. I— I thought it actually came through in Agent Block's testimony, but I— I might be wrong.
MR. DAVISON: I wish I could answer, but I— I don't think I'm in the right forum to do that.

**BY MR. DAVISON:**

Q. Um, so that naturally posed a problem that the defendant could not answer that question, for which, in a perfect world,

you wanted Dr. Dattilio— Dr. Dattilio to answer, right?
A. Yes, that's fair.
Q. And in the defense of the defendant, you tried to thread that needle.
A. Correct.
Q. And it just didn't work out because, at the Daubert hearing, it turned out that Dr. Dattilio did not have the capacity to draw that conclusion. Is that fair to say?
A. His answers were too, um, the w— the answers to your questions on cross-examination during the Daubert hearing gutted that, um, aspect of the defense.
Q. Now, the defense that uh, in this case, that you move forward with was one of entrapment, right?
A. Yes. And we also charged, um, we also tried to combat the element of intent. As well as, um, credibility and so forth, yes.
Q. Right. And the- and the element of intent, um, hinged on the fact of the defendant's contention that he believed he was communicating with an adult and he was just role-playing when he was communicating as if it was a child.
A. Correct.
Q. Did you see any other viable defense in this case?
A. If we did, we would have presented it, I imagine.
Q. And was that because the defendant was communicating with the undercover, came to the scene at the prescribed time with

condoms, and ultimately confessed that he was there to meet up with 14-year-old Marissa?

A. There were text messages in the case that was— that were, we argued, subject to interpretation and with our expert and so forth, but you couldn't change the words of the text messages, or there was a photograph of the alleged victim who was clearly young and was wearing braces if I recall. There was the statement by Mr. Davis with; I thought it was to Agent Block, um, including the— the statements that were not recorded, and the trip from New York to, I want to say Allentown, but it may have been Easton, um, where the meeting was supposed to take place.

Q. Okay.

A. And that he had brought along condoms to the meet.

Q. Okay, so there was strong evidence.

A. Strong evidence, yes.

Q. Okay.

A. But there was a— there— we had a defense.

Q. Do you believe, on behalf of Mr. Davis, you put forth the best defense you could?

A. Yes.

MR. DAVISON: Okay. I have nothing further.

THE COURT: All right. Any redirect?

MR. LEWIS: Briefly, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. LEWIS:**

Q. Ms. Meehan, you— you indicated your concern that it might have undermined the credibility of the defense lawyers to call Dr. Dattilio, right?

A. Yes.

Q. But you would agree you also had potential to undermine the credibility of defense counsel to not call Dr. Dattilio after promising the jury that you would.

A. I— I think it's a— it's— it's a balancing test. Um, do we present a witness who previously imploded on the witness stand under oath that was going to be subject to another presumably difficult and brutal cross-examination and look like we don't know what we're doing, or do we call him for what is really a limited purpose and it— it really didn't have any relevance after there was the distinguishing between the victim being 14 and Dr. Dattilio's representations about the meaning of a pedophile who was attracted to 13-year-olds and younger. So, on balance, we thought it much more— much riskier, much more dangerous to call Dr. Dattilio.

Q. But, Ms. Meehan, Dr. Dattilio told you that he had assessed whether Mr. Davis was attracted to children older than 13 also and had concluded, based upon his testing, his interviews, his review of the case file, bring to bear his expertise on how you assess truthfulness, that on all of these things that are described in the 19-page report, he came to the conclusion that

Mr. Davis wasn't attracted to 14-year-olds either, right?
A. Put like that, yes, when he was subjected to cross-examination under oath, it did not come across that way at all, and he did not appear to be the expert that he normally had the reputation of being, um, and— and that his report, the way his report read, so, unfortunately, we wanted to win. We— we- we put up a case, we prepared as— as hard as we could, we had four people from the office, we had a hotel room, we did as— as best we could with what we had, and we wanted to win, and, frankly, Dr. Dattilio messed up.
Q. But I'm just going back to your comment that had relevance. You could— if— if Dr. Dattilio was willing to testify at trial, consistently with what he had told you before the Daubert hearing, his testimony would have been relevant, right?
A. It— it would have been relevant, but then there's cross.
Q. You thought it was going to be relevant based on your conversations with him, which is why you opened to the jury that you would be calling him.
A. Correct. With his re— I'm sorry.
Q. So you didn't question that Dr. Dattilio was capable of giving relevant testimony based on the evaluation and assessment he performed?
A. After the Daubert hearing, we most certainly did question that.
Q. Well, did you— before you conduct— before the Daubert

hearing, um, had you asked Dr. Dattilio questions like the ones that the court and Mr. Davison asked Dr. Dattilio at the Daubert hearing?
A. I don't recall doing so, no. You mean regarding hebephe— the difference between pedophilia and hebephilia? I don't recall doing that, no.
Q. Okay. Well, putting aside the use of the term— of the particular phrases, the substance of whether Mr. Davis was attracted- sexually attracted, in his opinion, to 14-year-olds, you had discussed that with Dr. Dattilio.
A. Yes. Yes.
Q. Okay. And so you were con— you were concerned, if you call him as a trial witness, after preparing him well for trial, and he testified that his opinion was that Mr. Davis is not sexually attracted to 14-year-olds, your concern is that he would be cross-examined and confronted with his Daubert testimony, right?
A. That was a huge concern, yes.
Q. And did you— did you prepare Dr. Dattilio to explain, to respond, um, to deal with that kind of cross-examination, such as explaining that he was tired and he misused his words at the hearing, but his conclusion always has been, and still is, that Mr. Davis is not sexually attracted to 14-year-olds?
A. That wasn't the only problem with—
Q. Well, the question is not— the question is not whether

that's the only problem. Did you prepare him to do that?

A. We had a visceral reaction to Dr. Dattilio's testimony, and- and I believe we talked to— he called either myself or Ms. Henry, and we talked for a few minutes. I'm sure we were on speakerphone because we were all in the hotel. Um, we had sort of a suite, so we were preparing at the Grand Estonian, and I'm sure we had him on speakerphone, and he was apologetic, but we felt that he could not be rehabilitated. And the other problem was that it came to light during the Daubert hearing that the majority of the report was just Mr. Davis himself saying what he says. And that— yes, there was testing, yes, he spoke to some family members, but the majority— the large percentage of his opinion was totally based on Mr. Davis. So if he came across poorly before the jury at trial, Dr. Dattilio, then Mr. Davis would be ruined for any testimony.

Q. You say it was just based on Mr. Davis. Did Dr. Dattilio explain to you that he used his professional expertise in listening to Mr. Davis and wa— and using his experience and knowledge?

A. He did better in phone conversations and preparation than he did on cross-examination.

Q. Right. And, um, during Dr. Dattilio's Daubert testimony, he didn't say anything that was affirmatively harmful to Mr. Davis, did he?

A. I— I need to think, actually, because I— I know that we

thought his testimony would be harmful. Yes, he did. In my opinion, yes.

Q. Well, what— what did he say that was affirmatively harmful to Mr. Davis if the jury heard?

A. So there were questions when both the court was questioning the relevance, and- and Attorney Davison was asking him about a pedophile. Could somebody who's not a pedo— who is not a pedophile be attracted to individuals 14 or older? And Dr. Dattilio said yes, and I believe it was twice; it might have been more than that, and that was terrible for our case because the alleged victim was 14.

Q. But when he was answering that question, he was answering a hypothetical that treated the definition of pedophile as 13 and under, right?

A. Yes, but he's the Harvard grad expert who's supposed to be distinguishing this in his expert report and then telling the jury, "Well, this is why I used— this term means this, but you folks probably know it better as generally pedophilia." And that's not the way he came across in cross-examination, and it's not the way his report read in hindsight after Mr. Davison's cross-examination.

Q. Before the hearing, Dr. Dattilio was willing to testify that Mr. Davis, in his opinion, was not sexually attracted to 14-year-olds.

A. And we were going to call him to say that, yes.

Q. And he was still willing to give that testimony after the Daubert hearing, wasn't he?

A. It was too late, but yes.

Q. You were concerned he could be cross-examined with his Daubert hearing testimony?

A. He would be cross-examined.

Q. And you could have prepared him for that cross-examination by, for example, having him explain that he didn't speak clearly, he was very tired, he wasn't prepared by Mr. Davis's lawyers to testify at a Daubert hearing, and walking through it more slowly, Mr. Davis is not only not a pedophile as measured by the under 13 definition, but is not a pedophile when you use the expanded definition that brings in 14 and 15-year-olds. He would have been willing to testify to that, wouldn't he have?

A. He would have been, but we made a strategic call not to because he is— if we had gone through his credentials with the jury, which we— we would have wanted to do, that he's been an expert for many years, he's testified hundreds of times, he's done hundreds of evaluations, he looked rather foolish on the stand during the Daubert for somebody who had that level of experience and expertise, and we could not figure out a way of fixing that, quite frankly.

Q. Did you try by asking him questions at a prep session in between the hearing and the time when you rested?

A. I don't recall specifically doing so. We had a conversation

with him when he called, but I don't— I'm sure during the conversation he said, "I will be rested, I'll do better," and I— I don't recall the specific conversation. The nature of the conversation, I'm sure, was that, but we didn't do a preparation. We were basically going back and forth about how disastrous it was.

Q. So Dr. Dattilio was himself capable of recognizing that he had been imprecise, for lack of a better word, in the Daubert hearing, and told you he was capable of being more precise and more helpful to Mr. Davis at the trial.

A. Yes, I'm sure he did.

MR. LEWIS: Thank you.

MR. DAVISON: Just, like, two questions.

**RECROSS EXAMINATION**

**BY MR. DAVISON:**

Q. Do you recall if Dr. Dattilio indicated that he was imprecise in his testimony at the Daubert hearing or in his report?

A. I— I don't recall. I— what I recall from Dr. Dattilio is him saying that he had— he was exhausted, he had been testifying all day in Northampton County, um, that's what I recall, and— and my other recollection is that our team, specifically the four of us, but— but more specifically, Ms. Henry and myself, decided that he was too dangerous to put on the stand in our case in chief— in our defense, um, and would

do more damage than— than would help Mr. Davis.

MR. LEWIS: Okay. No further questions for Ms. Meehan.

THE COURT: All right. Thank you. May this witness be excused?

MR. LEWIS: Yes.

THE COURT: Thank you.

MS. MEEHAN: Thank you, Your Honor.

THE COURT: Okay, it's my understanding, then, that there will be no further, uh, witnesses.

MR. LEWIS: Um, we may wish to recall Mr. Davis just to ask one question.

THE COURT: All right.

UNIDENTIFIED SPEAKER: (Inaudible)

MS. MEEHAN: May I be excused, Your Honor?

THE COURT: Yeah. Mr. Davis? Mr. Davis, you're still under oath. You understand that?

MR. DAVIS: I do, sir.

THE COURT: All right, please sit down. Your counsel has a question.

**RECALL EXAMINATION**

**BY MR. DAVISON:**

Q. Um, Mr. Davis, did you listen to— and under— did you— were you able to listen to and hear all of Ms. Meehan's testimony at this hearing?

A. Yes.

Q. I just want to draw your attention to her testimony, where she testified that she didn't specifically remember the content of her conversation with you about Dattilio after he testified, but you— to paraphrase, you— you must have been involved in the decision to not call him as a trial witness. Do you remember her giving that testimony?

A. Yes.

Q. Were you in any way involved in a decision to not call Dr. Dattilio at the trial?

A. I remember clearly, Wednesday morning, we arrived in court; the jury came in, everybody was seated, the judge was there, and when— I believe it was Ms. Henry who stood up and said, "The defense rests." And I was shocked. I looked at them and said, "Where's Dr. Dattilio?" That was the first I heard. I'm under oath. This is the first time I heard or knew that they weren't gonna call him. I didn't know. They never mentioned anything. And then, when I asked them at trial, "Why aren't you gonna call him?" they said he did so terrible at the Daubert hearing that we decided not to call him, and I asked around the table to the other colleagues who were there, and they all agreed with that opinion.

Q. But that was the first time you were involved in a conversation, uh, about not calling him at the trial when they already made the decision without you.

A. Correct. On Friday afternoon, as the record reflects, um, Dr. Dattilio was supposed to be there Wednesday morning. My attorneys told that to the court. They told it to the judge. He was supposed to come. There was no discussion about him not coming beforehand, and as the record reflects, they were supposed to call him in the morning.
Q. Thank you. But, sir, you did have a discussion with both your counsel after Dr. Dattilio testified at the Daubert hearing, right?
A. Yes.
Q. And you described earlier— you said, "This gives us the ammo for trial," right?
A. Correct.
Q. So you did have a discussion with them about his performance at the Daubert hearing, is that right?
A. Correct.
Q. And you shared your opinion to them?
A. The opinion that—
Q. You shared your opinion with them?
A. About my- now having to be able to prepare him properly.
Q. No, about your view of how Dr. Dattilio performed, right?
A. No, I did not— I don't believe I shared my opinion, but I did mention that he didn't— he could have been much better. So I guess that's my opinion, yes.
Q. So you were disappointed in Dr. Dattilio's performance at

the Daubert hearing?

A. I'm very biased, so I wouldn't say I was disappointed, but I was happy that that wasn't in front of the jury.

Q. Well, I think that sounds like the same thing. Could you— could you expand on that? What— you weren't disappointed, but you weren't happy.

A. Testimony— testimony in the Daubert hearing is really irrelevant to a— to a jury. In my— what— how I thought of it is irrelevant to the jury. The jury's gonna make the ultimate decision. So how he— how he performed during a Daubert hearing was really, uh, it's not disappointed or not disappointed; it gave me hope towards his testimony that he would perform much better, 'cause now we had the proper— we were able to prepare properly for the jury to hear what we needed them to hear— what he, what his opinion was.

Q. Because you thought he could just start fresh at trial, and he'd be better the next time, right?

A. Um, Ms. Meehan extensively mentioned and basically sang his praises about how great he was in court, and her colleagues use them, and she uses him, and she really went overboard to praise him, so the fact that he didn't perform well late in the afternoon after he was on trial all day at one time, really is not a, um, it didn't give me a picture of how he would perform in front of a jury.

Q. Right, so you thought you would— he would testify in front

of the jury. He would have clean slate to present much better, right?

A. The last I spoke to my attorneys, that was the plan, that he was going to be prepared properly, and we were going to have him Wednesday morning.

Q. Okay, because you're not a trained attorney, you wouldn't realize that all the statements he made in the Daubert hearing would be able to be used against him at trial. Did that— did that ever dawn on you?

A. That did not dawn on me.

MR. LEWIS: Okay, thank you.

THE COURT: I thought I heard you say that you wouldn't want him to testify in front of the jury the way he testified at the Daubert hearing. Is that right?

MR. DAVIS: Um, there were certain aspects that I wouldn't— wouldn't have wanted.

THE COURT: So, if you would have testified that way in front of the jury, that wouldn't have been good for you?

MR. DAVIS: Um, that's— I believe that.

THE COURT: Counsel?

MR. DAVISON: Nothing further.

MR. LEWIS: No, Your Honor.

THE COURT: All right, I think the testimony's closed.

MR. DAVISON: Yes.

THE COURT: All right, uh, how do we want to handle briefing?

MR. LEWIS: Uh, we would like to submit post-hearing, uh, briefs.

THE COURT: Do we want to try to get transcripts first?

MR. LEWIS: Yes.

THE COURT: I don't know how long that would take. All right, well then, I'll set a briefing- we'll order transcripts of, uh, today's hearing. I'll set a briefing schedule for so many days after you receive the transcript and then so many days, uh, after you file your brief for the government to respond.

MR. LEWIS: Could we have, uh, about three weeks after we receive the transcript?

THE COURT: Sure. Yeah. I think that's reasonable. And, uh, the same then for, uh, Mr. Davison.

MR. DAVISON: Thank you.

THE COURT: All right. We'll be entering orders then unless, uh, if there's anything else and either counsel wants to put anything else on the record, uh, we will be adjourned for today.

MR. DAVISON: Thank you.

MR. LEWIS: Your Honor, we— we might ask for a reply after we receive Mr. Davison's opposition. I don't know if you

want to schedule that now.

THE COURT: Yeah, that's good. We'll put that in the order then.

MR. LEWIS: We'd like that two weeks after the government's opposition.

THE COURT: Okay.

MR. LEWIS: Thank you.

THE COURT: I'll put that in the order. We'll work on an order either today or, tomorrow, or next week. There's a lot of stuff going on. As you know, when we were trying to schedule this, so, um, everybody's free to go, um, I just have one question for counsel. You are now going to be involved in the Savini case; is that true?

MR. DAVISON: No, no, absolutely not, nice try.

THE COURT: I have a major case that's going for Labor Day, and all the U.S. attorneys are leaving, and there's going to be a whole new team. So it's somebody, it's a name like your name?

MR. DAVISON: Uh, it's Mr. Shikatano?

THE COURT: Yeah, no, no.

MR. DAVISON: Uh, Drew Jeniman, is that?

THE COURT: Eh, maybe.

MR. DAVISON: Andrew Jeniman. Uh, Shikatano and one other.

THE COURT: One of the counsel is deaf for the U.S.

Attorney's Office. Did I read that?

MR. DAVISON: That's news to me.

UNIDENTIFIED SPEAKER: I'm sorry, Your Honor, I think his name is Kanterman, I believe.

THE COURT: Kenderman?

UNIDENTIFIED SPEAKER: Kanterman.

THE COURT: Kanterman?

UNIDENTIFIED SPEAKER: Yeah, I just received—

THE COURT: We got something about (unintelligible) everything in real-time, too, so.

MR. DAVISON: Maybe it's someone from Main Justice, uh, because I've never heard-

THE COURT: Somebody from Main Justice died, too.

MR. DAVISON: Really?

THE COURT: A money laundering expert or something.

MR. DAVISON: Huh.

THE COURT: So, uh-

MR. DAVISON: I'm sor— I don't have much information.

THE COURT: I apologize. I'm just trying to get a handle on this case.

MR. DAVISON: Yeah. Um...

THE COURT: Uh, for various— for good reason. All right. Thanks, everybody.

MR. DAVISON: Thank you.

MR. LEWIS: Thank you.

(Proceedings concluded at 2:25 p.m.)

C E R T I F I C A T E

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

______________________________ 7/7/2025______
Signature of Transcriber Date

Oren Kwiatek______________________________
Typed or Printed Name